Kathy STUPAK–THRALL, Plaintiff,

v.

UNITED STATES of America and Michael Espy, Secretary of Agriculture, individually and in his official capacity, Defendants.

Michael A. GAJEWSKI and Bodil Gajewski, husband and wife, Plaintiffs,

v.

UNITED STATES of America and Michael Espy, Secretary of Agriculture, individually and in his official capacity, Defendants.

Nos. 2:93–CV–65, 2:93–CV–66.

United States District Court, W.D. Michigan, N.D.

Jan. 25, 1994.

Mark D. Tousignant, Mark D. Tousignant, P.C., Iron River, MI, J. Bushnell Nielsen, Hinshaw & Culbertson, Milwaukee, WI, William Perry Pendley, John G. Nelson, Todd S. Welch, Mountain States Legal Foundation, Denver, CO, for Kathy Stupak–Thrall.

Judd R. Spray, Asst. U.S. Atty., Michael H. Dettmer, U.S. Atty., Marquette, MI, for defendants.

Mark D. Tousignant, Mark D. Tousignant, P.C., Iron River, MI, for Michael A. Gajewski, Bodil Gajewski.

## OPINION

QUIST, District Judge.

Plaintiffs in these consolidated cases are owners of recreational and resort property on the northern shore of Crooked Lake in the Upper Peninsula of Michigan. Most of Crooked Lake is within the Sylvania Wilderness, which is administered by the Department of Agriculture Forest Service (the Forest Service). Plaintiffs' actions seek review of a decision by the Forest Service to regulate various activities on Crooked Lake promulgated in Amendment No. 1 to its Land Resource Management Plan. They also claim that the restrictions in Amendment No. 1 constitute an unconstitutional taking without formal condemnation or payment of compensation for an interest in plaintiffs' property in violation of the Fifth Amendment. Plaintiff Stupak–Thrall claims $10,000 in compensation for the taking; the Gajewskis claim $40,000.

The issues were bifurcated and the parties have filed cross-motions for summary judgment on the first claim only, not the taking claim. At issue in the motions is whether Amendment No. 1 unlawfully infringes on plaintiffs' riparian rights or exceeds the constitutional authority of Congress under the Property Clause.

### Background Information

Crooked Lake, as described by the Forest Service and as apparent on a map of the Sylvania Wilderness Area, is made up of several relatively large irregularly shaped bays, connected by narrow channels. All of Crooked Lake is within the Sylvania Wilderness except the northern shore of the northmost bay, where plaintiffs' property is located. Approximately 95% of the lake's shoreline is within the Wilderness. Amendment No. 1 regulates activities within the Sylvania Wilderness and thus applies to all but the bay on which the plaintiffs' property is located. The Amendment restrictions to which plaintiffs object are regulations prohibiting the use of houseboats and sailboats and discouraging the use of electronic fish-finders, boom-boxes, and other mechanical or battery operated devices.

■ Riparian rights are the rights of owners on the banks of watercourses to the use of the water, including rights to fish, boat, sail, swim, water ski, and ice skate. The owners share in common the right to make reasonable use of the entire surface of the lake. *Hall v. Wantz,* 336 Mich. 112, 116, 57 N.W.2d 462, 464 (1953); *Burt v. Munger,* 314 Mich. 659, 661, 23 N.W.2d 117, 119–20 (1946).

Plaintiffs claim that the restrictions in Amendment No. 1 interfere with their riparian rights and violate the Michigan Wilder-

ness Act of 1987 (MWA) which provides that administration of the wilderness areas designated by the MWA shall be subject to "valid existing rights." They also argue that, even if the Forest Service acted within its authority under the Wilderness Act of 1964 (Wilderness Act) and the MWA in implementing Amendment No. 1, its action exceeds the government's constitutional authority under the Property Clause of the Constitution, Art. IV, § 3, cl. 2, because the Forest Service seeks to regulate plaintiffs' property, not property belonging to the United States, and is acting for a purpose not recognized under the Property Clause.

Plaintiffs appealed the decision to adopt Amendment No. 1 to the Regional Forester, who affirmed the decision on October 26, 1992. The Chief of the United States Forest Service affirmed the administrative decision on January 7, 1993. The Forest Service determined that Amendment No. 1 is authorized by the MWA and the Wilderness Act. The MWA, which designated the Sylvania Wilderness under the authority of the Wilderness Act, provides:

> Subject to valid existing rights, each wilderness area designated by this Act shall be administered by the Secretary of Agriculture in accordance with the provisions of the Wilderness Act of 1964 governing areas designated by the Act as wilderness areas.

Pub.L. No. 100–181, 101 Stat. 1274, 1275–76 (1987). The Wilderness Act, in turn, provides:

> Except as specifically provided for in this Act [16 USCS §§ 1131 et seq.], and subject to existing private rights, there shall be no commercial enterprise and no permanent road within any wilderness area designated by this Act [16 USCS §§ 1131 et seq.] and, except as necessary to meet minimum requirements for the administration of the area for the purpose of this Act [16 USCS §§ 1131 et seq.] (including measures required in emergencies involving the health and safety of persons within the area), there shall be no temporary road, no use of motor vehicles, motorized equipment or motorboats, no landing of aircraft, no other form of mechanical transport, and no structure or installation within any such area.

16 U.S.C.A. § 1133(c). The Wilderness Act specifically provides that "the use of aircraft or motorboats, where these uses have already become established, may be permitted to continue subject to such restrictions as the Secretary of Agriculture deems desirable." 16 U.S.C.A. § 1133(d)(1). The Secretary thus has discretion to permit the use of motorboats on Crooked Lake, but has not been given discretion under the Wilderness Act to permit other motorized equipment or mechanical transport on the lake.

The Forest Service does not dispute that plaintiffs are riparian owners and have riparian rights to use the surface water of Crooked Lake under Michigan law. It argues that the "valid existing rights" language in the MWA does not protect plaintiffs' riparian rights because it refers only to subsurface mineral rights in the Nordhouse Dunes area and does not include riparian rights. The Forest Service also asserts that, if riparian rights are protected by the MWA or the Wilderness Act, the Forest Service is authorized to regulate them under the Property Clause and the reasonable use doctrine.

### *Standard of Review*

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56. Plaintiffs and defendant agree that the facts in this case are not disputed and that the issues before the Court are purely issues of law.

In evaluating the decision of an administrative agency of the federal government, a court may set aside a regulation only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.,* 463 U.S. 29, 41, 103 S.Ct. 2856, 2865, 77 L.Ed.2d 443 (1983). The factors to consider when a court reviews an agency's construction of a statute are set forth in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984):

When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

No deference need be shown to an agency decision when the issue is whether the agency acted within its authority and power or when the constitutionality of its action is questioned. *See Borlem S.A.–Empreedimentos Industriais v. United States,* 913 F.2d 933, 937 (Fed.Cir.1990) ("deference should not apply when the issue is the legal scope of an agency's authority") (citing *Social Sec. Bd. v. Nierotko,* 327 U.S. 358, 369, 66 S.Ct. 637, 643, 90 L.Ed. 718 (1946)); *Rydeen v. Quigg,* 748 F.Supp. 900, 905 (D.D.C. 1990), *aff'd,* 937 F.2d 623 (D.C.Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 974, 117 L.Ed.2d 138 (1992) ("when reviewing constitutional challenges to agency decisionmaking, courts make an independent assessment of the facts and the law") (citing *Pickering v. Board of Educ. of Township High School Dist. 205, Will County,* 391 U.S. 563, 578–79 n. 2, 88 S.Ct. 1731, 1739–40 n. 2, 20 L.Ed.2d 811 (1968)).

### *"Valid Existing Rights"*

■ The Forest Service first justifies its regulation on the basis of statutory interpretation. It asserts that, under the MWA and the Wilderness Act, riparian rights are not included within the rights protected by the "valid existing rights" language. It notes that the MWA does not define the term "valid existing rights" and that the only instance in which the phrase is given substance in the MWA or in its legislative history is in connection with privately-owned mineral rights in the Nordhouse Dunes Wilderness. The Wilderness Act also makes specific mention of valid existing rights only in connection with mineral rights. On the basis of the statutory use of the phrase, the Forest Service concludes that "valid existing rights" refers exclusively to mineral rights and does not protect riparian rights.

The Forest Service's construction of the statute is not a permissible construction. The "valid existing rights" clause in the MWA is a simple, straightforward savings clause that is not limited to a particular kind of right. There is no language in the statutes or the legislative history that expressly limits the protected rights to mineral rights. The fact that, in the only instance in which the phrase is used in the MWA, the reference is to mineral rights in the Nordhouse Dunes Wilderness does not mean that "valid existing rights" do not include riparian rights.

"When the intent of Congress is expressed in 'reasonably plain terms,' a court must ordinarily treat that language as conclusive." *United States v. Underhill,* 813 F.2d 105, 111 (6th Cir.1987) (citing *Griffin v. Oceanic Contractors, Inc.,* 458 U.S. 564, 570, 102 S.Ct. 3245, 3249, 73 L.Ed.2d 973 (1982)), *cert. denied,* 482 U.S. 906, 107 S.Ct. 2484, 96 L.Ed.2d 376 (1987). An interpretation contrary to the literal meaning of the words is warranted only when " 'the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters.' " *Id.* (quoting *Griffin,* 458 U.S. at 571, 102 S.Ct. at 3250). In this instance, the MWA should be read to make administration of the Sylvania Wilderness subject to plaintiffs' valid riparian rights, as established under state law.

### *Regulating Riparian Rights*

■ The next step is to determine whether the actions the Forest Service took to regulate plaintiffs' riparian rights to Crooked Lake are within its authority and power. Plaintiffs assert that the clause providing

that administration of the wilderness areas are "[s]ubject to valid existing rights" means that all management decisions that interfere with any recognized riparian right are barred. Riparian rights are not, however, absolute rights. They may be regulated under the police powers of governmental units. In addition, when the uses of riparian owners are in conflict, riparian rights may be limited by the reasonable use doctrine.

### Regulation Under Police Powers

Under Michigan law, local governments have the power to regulate riparian activities on lakes within their jurisdictions. Regulations that limit the number of boats riparian owners are permitted to dock on their property and limit the hours for waterskiing have been upheld by Michigan courts. These regulations were imposed pursuant to the power of local governments to protect the public health, safety, and general welfare of persons and property within their communities. *Square Lake Hills Condominium Ass'n v. Bloomfield Twp.*, 437 Mich. 310, 322, 471 N.W.2d 321, 326 (1991), *reh'g denied*, 437 Mich. 1280, 472 N.W.2d 287 (1991) ("regulation of boat docking and launching by Bloomfield Township on inland lakes is a perfectly reasonable use of township police power"); *Miller v. Fabius Township Bd., St. Joseph County*, 366 Mich. 250, 258–60, 114 N.W.2d 205, 209–10 (1962) (township has power to regulate water skiing).

In regulating the uses of Crooked Lake, the Forest Service is acting not under the police power afforded a local governmental body but, instead, is acting on the basis of the Property Clause of the United States Constitution, Art. IV, § 3, cl. 2, which states: "Congress shall have the Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." Plaintiffs object that the regulations pertaining to use of the surface of the lake concern property that is not within the exclusive domain of the Forest Service. The surface of Crooked Lake is property held in common by the Forest Service and private riparian landowners. Plaintiffs argue that the Property Clause does not give the United States government the power to regulate such property. Although plaintiffs admit that Congress has the power to regulate activity taking place on non-federal property when such legislation is necessary to effectuate the government's power to regulate the use and occupancy of federal land and to protect the land from damage, they argue that the regulations in Amendment No. 1 that affect their riparian rights are unlawful. They assert that there is no means-to-ends relationship between the regulations, which are directed toward furthering the purposes set forth in the Wilderness Act, and the exercise of Congressional power to control the use and occupancy of federal land. In essence, plaintiffs argue that the regulations are invalid because they are not directed at protecting the federal land.

Plaintiffs are correct in asserting that, in this instance, the federal government is regulating nonfederal as well as federal property. The nonfederal property that is being regulated is the private owners' share of rights in the portion of Crooked Lake within the Sylvania Wilderness. The bay on which plaintiffs' property is located is not subject to the regulations, but plaintiffs hold rights in common with the federal government over the 95% of the lake within the Wilderness.

Plaintiffs' argument is unsound, however, in asserting that the federal government does not have the power to regulate this property. As quoted above, the Wilderness Act mandates that there be no motorized equipment or other form of mechanical transport in wilderness areas. This requirement is clearly directed at protecting the wilderness quality of the areas so designated. The regulations at issue are consistent with the statutory directive.

The Wilderness Act was established to "secure for the American people of present and future generations the benefits of an enduring resource of wilderness." 16 U.S.C.S. § 1131(a). For this purpose, Congress directed that wilderness areas be designated and that they

> be administered for the use and enjoyment of the American people in such manner as will leave them unimpaired for future use and enjoyment as wilderness, and so as to

provide for the protection of these areas, the preservation of their wilderness character, and for the gathering and dissemination of information regarding their use and enjoyment as wilderness.

*Id.* To protect and preserve the wilderness character of the areas designated wilderness, Congress directed the agencies responsible for administering the wilderness areas to prohibit motorized equipment and mechanical transport, as set forth in Section 1133(c), quoted above.

Plaintiffs want to distinguish between protecting the wilderness quality of lands and protecting federal land itself. The Supreme Court addressed a similar argument in *Kleppe v. New Mexico*, 426 U.S. 529, 96 S.Ct. 2285, 49 L.Ed.2d 34 (1976). The case involved federal regulations on the capture of wild horses and burros on federal land. The state of New Mexico and the lower court maintained that the Property Clause enabled the federal government to regulate the wild animals on federal property only for the protection of the land, not the animals themselves. The Court upheld the power of the federal government, under the Property Clause, to establish regulations to protect wild animals on federal land. *Id.* at 546, 96 S.Ct. at 2295. The Court noted that "determinations under the Property Clause are entrusted primarily to the judgment of Congress." *Id.* at 536, 96 S.Ct. at 2290. The Court also explained that the Property Clause "in broad terms, gives Congress the power to determine what are 'needful' rules 'respecting' the public lands." *Id.* at 539, 96 S.Ct. at 2291. In addition, it noted that in *Camfield v. United States,* 167 U.S. 518, 17 S.Ct. 864, 42 L.Ed. 260 (1897), the Court's "sole message is that the power granted by the Property Clause is broad enough to reach beyond territorial limits," although the *Kleppe* court did not address the outer boundaries of the reach of Congress's power under the Property Clause. *Id.* at 538–39, 96 S.Ct. at 2291.

Several court of appeal cases have directly addressed the power of Congress to regulate non-federal property in close proximity to federal property. The instant case, which involves the regulation of private property in the midst of a federal wilderness area, is similar to *United States v. Lindsey,* 595 F.2d 5 (9th Cir.1979), which challenged federal restrictions limiting camping and campfires on state land that was surrounded by federal land. The court held that the regulation was well within the powers of the Property Clause. *Id.* at 6. The instant case is also similar to two cases concerning the regulation of riparian activities on state waters within federal lands in Minnesota. In *United States v. Brown,* 552 F.2d 817 (1977), *cert. denied,* 431 U.S. 949, 97 S.Ct. 2666, 53 L.Ed.2d 266 (1977), plaintiff objected to a federal regulation restricting hunting in Voyager National Park on the grounds that he was hunting on water owned by the State of Minnesota. The court held that the regulations against hunting on waterways within the park "are valid prescriptions designed to promote the purposes of the federal lands within the national park." *Id.* at 822. In *Minnesota by Alexander v. Block,* 660 F.2d 1240 (8th Cir.1981), *cert. denied,* 455 U.S. 1007, 102 S.Ct. 1645, 71 L.Ed.2d 876 (1982), which concerned federal prohibitions on the use of motorboats on most of the waterways within the Boundary Waters Canoe Area Wilderness, which were largely owned by the state, the court held that the regulations were with the power of the Forest Service:

> Congress clearly has the power to dedicate federal land for particular purposes. As a necessary incident of that power, Congress must have the ability to insure that these lands be protected against interference with their intended purpose.

*Id.* at 1249.

The regulations the Forest Service has enacted for the Sylvania Wilderness are consistent with the Congressional mandate and directives for wilderness areas. It is within the power of Congress under the Property Clause to set aside federal land as wilderness and to protect, preserve and, if necessary, restore the wilderness quality of that land by regulating private as well as federal property on lakes within a wilderness area.

*Reasonable Use*

■ The MWA states that the administration of wilderness areas created by the Act

are to be subject to "valid existing rights." To follow that requirement in this instance, with respect to riparian rights, requires consideration of whether the restriction is reasonable. Riparian rights are not absolute but come encumbered with the possibility of being limited or regulated under the "reasonable use" doctrine. The reasonable use doctrine provides that recreational riparian rights may be exercised only to the extent that they are "reasonable in light of the correlative rights of the other proprietors." *Thompson v. Enz*, 379 Mich. 667, 687, 154 N.W.2d 473, 484 (1967). Michigan courts have imposed limitations on riparian rights under the "reasonable use" doctrine in instances where there was a conflict between private owners regarding the uses or proposed uses of certain riparian owners. *See id.; Pierce v. Riley*, 35 Mich.App. 122, 192 N.W.2d 366 (1971). The Forest Service stands as a private owner as well as a governmental body with respect to riparian rights in Crooked Lake. *See Kleppe v. New Mexico*, 426 U.S. at 540, 96 S.Ct. at 2292 ("Congress exercises the powers both of a proprietor and of a legislature over the public domain"). The restrictions in Amendment No. 1 are consistent with valid existing rights because they are permissible under the "reasonable use" doctrine.

In *Thompson v. Enz*, plaintiffs were riparian owners on Gun Lake. They sought to block a proposed development that would give lake access to more that 125 back lot purchasers through an artificial channel. 379 Mich. at 675, 154 N.W.2d at 478. The court analyzed the rights of riparian owners as follows:

> Riparian uses are divided generally into two classes. The first of these is for natural purposes. These uses encompass all those absolutely necessary for the existence of the riparian proprietor and his family, such as to quench thirst and for household purposes. Without these uses both man and beast would perish. Users for natural purposes enjoy a preferred nonproratable position with respect to all other users rather than a correlative one.

> The second of these is a use for artificial purposes. Artificial uses are those which merely increase one's comfort and prosperity and do not rank as essential to his existence, such as commercial profit and recreation. Users for artificial purposes occupy a correlative status with the other riparians in exercise of their riparian rights for artificial purposes. Use for an artificial purpose must be (a) only for the benefit of the riparian land and (b) reasonable in light of the correlative rights of the other proprietors.

*Id.* at 686–87, 154 N.W.2d at 483–84. In *Thompson*, the Michigan Supreme Court reversed the Michigan Court of Appeals, which had granted summary judgment to defendant, and remanded the case for a determination of the reasonableness of the proposed use. It directed the trial court to consider the following factors in determining whether the use was reasonable:

> First, attention should be given to the watercourse and its attributes, including its size, character and natural state....

> Second, the trial court should examine the use itself as to its type, extent, necessity, effect on the quantity, quality and level of the water, and the purposes of the users....

> Third, it is necessary to examine the proposed artificial use in relation to the consequential effects, including the benefits obtained and the detriment suffered, on the correlative rights and interests of other riparian proprietors and also on the interests of the State, including fishing, navigation, and conservation.

*Id.* at 688–89, 154 N.W.2d at 484–85.

None of the Michigan court cases regarding conflicts between private owners over the reasonable use of riparian property involves uses similar to those at issue here. Nonetheless, when the criteria set forth in *Thompson* are applied in the instant case, it is apparent that the Forest Service's proposed use is not unreasonable. In considering the watercourse and its size, character, and natural state, I note that Crooked Lake is made up of bays, that the federal government owns 95% of the shoreline, and that the bay on which plaintiffs' property is located is not subject to the restrictions. I also note that the Forest Service restrictions do not interfere with the natural state of Crooked Lake

**334**

but, instead, protect and preserve its natural state.

In considering the uses themselves as to type, extent, necessity, effect on the quantity, quality and level of the water, and the purposes of the users, I note that the Forest Service restrictions reduce rather than expand the uses of Crooked Lake. The Forest Service has banned sailboats and houseboats and seeks to discourage the use of fish finders and boom boxes for the purpose of bringing the Sylvania Wilderness into compliance with the restrictions mandated by Congress in the Wilderness Act which are directed toward protecting and preserving the wilderness character of the area. I also note that the restrictions have minimal impact on plaintiffs' riparian uses of Crooked Lake. There is no evidence that sailboats or houseboats, which are now banned, have ever been used on the lake. The regulation on fish finders and boom boxes does not ban their use but only states that their use is to be discouraged.

In considering the proposed restrictions on use in relation to the consequential effects on the rights and interests of plaintiffs and the State, I note that the restrictions will not prevent plaintiffs from using the whole surface of Crooked Lake but will impose slight restrictions on that use. In contrast, the restrictions will further State interests in conservation and will have a substantial positive effect on furthering the purpose of Congress in creating the Sylvania Wilderness. Implementation of the Forest Service Plan will permit the Forest Service to administer the Sylvania Wilderness in accordance with the direction of Congress, which determined that the elimination of mechanical transport and motorized devises was critical to the creation and maintenance of wilderness areas.

### CONCLUSION

For the reasons set forth above, plaintiffs' motions for summary judgment are **DENIED** and defendant's motions for summary judgment are **GRANTED**.