**Dr. Carlos F. MONTERO and Nives Montero, Plaintiffs,**

**v.**

**Bruce BABBITT, Secretary, Department of the Interior of the United States of America, and Nancy M. Kaufman, Acting Regional Director, United States Fish and Wildlife Service, Defendants.**

No. 93–CV–0545 (DRH).

United States District Court, E.D. New York.

March 28, 1996.

**136**

Corwin & Matthews by Charles T. Matthews, Huntington, New York, for plaintiffs.

Zachary W. Carter, United States Attorney, Eastern District of New York by Kevin Cleary, Asst. U.S. Atty., Brooklyn, New York, for defendants.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

HURLEY, District Judge.

### INTRODUCTION

By complaint dated February 5, 1993, plaintiffs commenced the present action, pursuant to the relevant provisions of the Administrative Procedure Act, 5 U.S.C. §§ 701–706, for review of a determination made under the authority of defendant, Bruce Babbitt, then Secretary of the Interior, by the Fish and Wildlife Service ("Wildlife Service"), denying plaintiffs a Special Use Permit ("permit") to construct a dock and boat ramp in the Oyster Bay National Wildlife Refuge ("Refuge"). That determination is challenged as being, *inter alia*, "arbitrary, capricious, unlawful and unconstitutional." (*See* Compl. ¶ 29.)

Defendants' response is essentially two-fold: (1) the Court lacks subject matter jurisdiction to adjudicate the present dispute to the extent that a portion of plaintiffs' claim attacks the validity of the conveyance by which the United States acquired title of the bay bottom, which attack is time barred under the Quiet Title Act, 28 U.S.C. § 2409a(g); and (2) the challenged determination by the Secretary's designee was appropriate, and not subject to vacatur as being arbitrary, capricious or an abuse of discretion.

The case was tried non-jury before the undersigned on January 26, April 17, 18, 19, and June 13, 1995.

### BACKGROUND

Plaintiffs are the owners of premises known as 28 Tennis Court Road, Village of Cove Neck, Oyster Bay, Nassau County, New York. These premises are designated on the Land and Tax Map of the County of Suffolk as Section 26, Block A, Lots 424 and 539. Lot 424 was acquired by plaintiffs in 1981, and Lot 539 was purchased by them from the Town of Oyster Bay in 1983. Lot 539 has frontage of approximately three hundred feet (300') along the mean high water mark of Cold Spring Harbor, a navigable body of water.

Plaintiffs moor a boat off their property, gaining access by the use of a dingy. In November of 1991, plaintiffs applied to the Wildlife Service for a permit to construct a pier and boat-launching ramp. The proposed structure would extend approximately one hundred and eighty feet (180') outward from the mean high water line, with the final ninety feet (90') being removable in the off-season. (Pls.' Ex. 30.)

By letter dated December 30, 1991, Barbara J. Pardo, a Deputy Project Leader for the Long Island National Wildlife Refuge Complex, advised plaintiffs that:

> It will be necessary to provide documentation that the dock was in operation in 1968. . . . Based on our inspection of the site, this dock no longer exists and is in total ruins. . . . Therefore, unless the evidence requested firmly establishes that the dock was in operation in 1968, it is still our intention to deny your request for a Special Use Permit.

(Pls.' Ex. 8.)

Thereafter, by letter dated January 16, 1992, Thomas W. Stewart, Refuge Manager of the Oyster Bay National Wildlife Refuge, informed plaintiffs that Ms. Pardo had given them erroneous information and that a permit would only be issued for "in-kind repairs to a currently usable structure." By way of explanation, Mr. Stewart stated in the January 16, 1992 letter:

> National wildlife refuges are administered under the authority of the National Wildlife Refuge System Administration Act of

1966. Regulations governing activities on national wildlife refuges are found in Title 50 Code of Federal Regulations (CFR), Subchapter C. Service policy is that all docks and piers which were built after the establishment of the Oyster Bay NWR (in 1968) for which authorizing permits were never issued are considered illegal structures and must be removed. This policy is derived directly from 50 CFR 27.92, which states: "No person shall without proper authority construct, install, occupy or maintain any ... dock ... or other structure or obstruction in any national wildlife refuge."

As for docks and piers which existed before the establishment of the Oyster Bay NWR, Refuge policy is to allow these "grandfathered" structures to remain in their current state (no permits required). Construction to existing piers and docks would require a Service Special Use Permit. However, the only construction for which a Special Use Permit would be issued would be in-kind repairs to a currently usable structure. Additions to, major modifications of, or replacement of historically existing structures would not be permitted.

Though this policy may seem harsh as it pertains to an individual dock, it is necessary that we consider the cumulative impacts of all such structures on refuge resources. There are numerous areas with which we are concerned, including but not limited to the following: leachate from construction material such as pressure treated wood, bottom paint, and bilge discharge, hazards and obstructions to navigation, dredging, disturbance to wintering and migrating waterfowl, intrusion into shellfishing beds, destruction of intertidal vegetation and animal life, etc.

In line with the aforementioned facts and concerns, this letter constitutes my formal denial of your request for a Special Use Permit for construction of a pier and boat launching ramp on the Oyster Bay National Wildlife Refuge.

(Pls.' Ex. 9.)

An application for reconsideration, and a series of unsuccessful administrative appeals followed, culminating in a final rejection by defendant Nancy M. Kaufman, Regional Director of the Wildlife Service. In her decision dated December 9, 1992, she reiterated that no permit would be issued for the construction of a new dock in the Refuge, as distinct from repairs or refurbishing of a dock in usable condition at the time the permit application was made. (Pls.' Ex. 37.)

To place the above dispute in context, some additional background information is required. A remote predecessor in interest to plaintiffs was J. Stewart Blackton. On March 24, 1913, the Town of Oyster Bay leased to Blackton for fifty years certain lands underwater in Cold Spring Harbor, which lands abutted Blackton's upland property. The purpose of the lease was to permit the lessee to traverse the shallow waters abutting his property to the navigable waters of Cold Spring Harbor.

Blackton built a boat house by water's edge, together with two docks—parallel to one another—which extended one hundred and fifty feet (150') perpendicular to the shoreline. The distance between the docks was dredged to the depth of ten feet (10').

By deed dated June 19, 1968, the Town of Oyster Bay ("the Town") conveyed to defendant United States of America certain lands below the mean high water line in Oyster Bay, Cold Spring Harbor and Mill Neck Creek. The deed provided that the real property was conveyed

for the following purposes only, to-wit, as an inviolate sanctuary for migratory birds and as a refuge for fish and wildlife and their natural habitat, and administered as such pursuant to the Migratory Bird Conservation Act of February 18, 1929 ... and as a nature preserve for scientific, educational and aesthetic purposes and in order to preserve its natural beauty both for this generation and for future generations, and that said premises shall be kept and maintained entirely in their natural state and operated for the aforementioned purposes only, without any disturbance whatever of habitat or plant or animal populations and undisturbed by any activities that might adversely affect the flora or the fauna, their natural habitat, or which

would impair the essential natural character of the premises....

(Pls.' Ex 1.)

The property became part of the National Wildlife Refuge System, and was designated as the Oyster Bay National Wildlife Refuge. As explained by Thomas Stewart, the Manager of the Refuge from 1988 to 1994, it is the largest of the federal refuges located on Long Island, with a size of approximately three thousand acres.

By 1968, little remained of the old Blackton complex. Plaintiffs' witness, Thomas McCarthy, testified that by that date the channel in front of the boat house no longer existed, and the boat house had largely collapsed. However, it does appear from this witness's testimony that one or more boats was docked in the area of the Blackton complex until the middle, and possibly the late, 1960s. Moreover, Regional Director Kaufman advised plaintiffs' then attorney, Kenneth A. Davis, Esq., in her December 9, 1992 letter that:

> You have ... proven to my satisfaction that the circa 1966 pier pre-dated the Refuge, and, therefore, would not require a U.S. Fish and Wildlife Special Use Permit to legally exist in its current state.

(Pls.' Ex. 37.)

Given defendants' admission that the pier existed in 1968, the Court finds that to be the fact, and turns its attention to the second requirement that an applicant must satisfy to obtain a permit, *viz.* that the dock was in usable condition at the time permission was sought. Here, Ms. Kaufman opined in her December 9, 1992 letter that:

> The critical point you have failed to prove is that the dock exists in a usable condition today. In fact, you conceded this point at the October 19 presentation.

*Id.*

Clearly, no usable docking facility existed on plaintiffs' property in 1991, and plaintiffs do not contend otherwise. Rather it is their position that the defendants' denial of the requested permit was unlawful for the reasons detailed below.

## POSITION OF PARTIES

Plaintiffs' attack on the defendants' denial of their application for a permit includes the following:

a) the government's title to the bay bottom is void due to the vague description of what was being conveyed under the 1968 deed and, accordingly, defendants are devoid of authority to regulate the property involved;

b) plaintiffs have riparian rights of access to navigable water and a concomitant right to build a dock for that purpose;

c) the denial of plaintiffs' application for a permit was arbitrary, capricious and unreasonable, constituted a taking of their riparian rights of access to the navigable waters of Cold Spring Harbor without payment of just compensation, and denied them due process of law;

d) the policy that a permit will only be issued for a "currently usable" dock is unlawful, void, arbitrary and capricious since it would prohibit reconstruction of docks destroyed in storms; and

e) that policy has not been consistently or reasonably applied by defendants within the Refuge.

In response, the government contends that:

a) to the extent the plaintiffs question the government's title to the bay bottom, the claim is barred by the Quiet Title Act;

b) even if, *arguendo*, plaintiffs have riparian rights to reach the navigable waters of Oyster Bay Harbor, such rights are not absolute, but rather are subject to reasonable governmental regulations;

c) the Wildlife Service's denial of a permit was not arbitrary, capricious, an abuse of discretion, or otherwise contrary to law; and

d) the Wildlife Service has applied the policy challenged by plaintiffs in a consistent manner.

## DISCUSSION

1. *Plaintiffs' Challenge to Title of the United States of America to Refuge Property*

█ Paragraph 29 of plaintiffs' complaint reads in pertinent part as follows:

The decision of the Acting Regional Director of the Fish and Wildlife Service is ... unlawful and void in that ... "[t]he description in the deed from the Town of Oyster Bay to the United States of America dated June 9, 1968, in Cold Spring Harbor in particular is insufficient to identify the property conveyed and is void." (Compl. ¶ 29.)

The targeted area of uncertainty involves the easterly boundary of the Refuge which is also the line that separates the Towns of Oyster Bay and Huntington. Precisely where that line lies has been the subject of dispute between the towns involved for decades. However, plaintiffs' property is far removed from the easterly boundary of the Refuge, thereby raising the question of their standing to advance this claim.

In any event, the Quiet Title Act, 28 U.S.C. § 2409a, clearly precludes the current challenge to the legitimacy of the federal government's title to the bay bottom. The Quiet Title Act represents a limited waiver by Congress of sovereign immunity. The Act provides that:

> any civil action under this section ... shall be barred unless it is commenced within twelve years of the date upon which it accrued. Such action shall be deemed to have accrued on the date the plaintiff or his predecessor in interest knew or should have known of the claim of the United States.

28 U.S.C. § 2409a(g).

Plaintiffs' title is traceable to the Town of Oyster Bay. The Town conveyed the bay bottom to the federal government in 1968 by deed recorded in that year. Thus plaintiffs' action twenty-five years thereafter is time barred.[1] *Block v. North Dakota,* 461 U.S. 273, 103 S.Ct. 1811, 75 L.Ed.2d 840 (1983).

2. *Denial of Special Use Permit is not Void as Violative of Plaintiffs' Riparian Rights*

■ Plaintiffs' property borders on Cold Spring Harbor. That circumstance calls into play the principle that ownership of land, which borders the mean high water line on a navigable body of water, carries with it the right of access from such land to navigable waters. *Gucker v. Town of Huntington,* 268 N.Y. 43, 47, 196 N.E. 737 (1935); Am.Jur.2d Waters Section 93.

Plaintiffs maintain that the 1968 conveyance from the Town of Oyster Bay to the United States of America did not affect their riparian rights because the rights vested in them, as the upland owners, not the Town. Accordingly, in plaintiffs' view, the federal government, as was true of the Town, must honor those rights. Assuming the accuracy of that statement, the question becomes whether defendants have denied plaintiffs their riparian rights of access to navigable water.

■ As observed in *Stupak–Thrall v. United States,* 843 F.Supp. 327, 331 (W.D.Mich., N.D., 1994) ("Riparian rights are not, however, absolute rights. They may be regulated under the police power of governmental units."), *aff'd,* 70 F.3d 881 (6th Cir. 1995). Indeed, under appropriate circumstances governmental restrictions may even be placed on private land which abuts public land when such restrictions are reasonably necessary to protect the federal interest, which is a scenario more onerous than that claimed by the present plaintiffs. *Free Enterprise Canoe Renters Ass'n v. Watt,* 711 F.2d 852, 855–56 (8th Cir.1983); *United States v. Lindsey,* 595 F.2d 5, 6 (9th Cir. 1979); *United States v. Brown,* 552 F.2d 817, 822 (8th Cir.), *cert. denied,* 431 U.S. 949, 97 S.Ct. 2666, 53 L.Ed.2d 266 (1977). Here, the landowners have not had their land encumbered. Nor have they been denied their riparian right of access to the navigable portions of the bay, although the mode of access has been limited to a dingy launched from the foreshore of their property. Accordingly, to the extent the purported denial of plaintiffs' riparian rights is asserted as an independent ground to invalidate defendants' decision, it is found to be without merit.

---

1. The above discussion regarding plaintiffs' challenge to the government's title to the bay bottom is a restatement of the Court's bench decision of April 18, 1995. (Tr. at 2–15.)

### 3. Defendants' Denial of a Special Use Permit to Construct a Dock Does not Deprive Plaintiffs of a Property Right Without Due Process of Law

■ Plaintiffs maintain that the denial of a permit deprived them of property without due process of law. In part, that claim is predicated on the belief that the restrictions imposed upon their riparian rights are unreasonable. The Court, as shall be explained later in this opinion, finds that position to be untenable. Plaintiffs further complain of a due process violation in that:

> ... the United States Department of Interior failed to provide an adequate statutory and policy basis for its denial of the Special Use Permit to plaintiffs. The statutory authority relied upon by ... [defendants] in denying plaintiffs' request [*viz.*] Title 50, Section 2792 of the Code of Federal Regulations (50 CFR 27.92), provides: ...
> No person shall without *proper authorities* construct, install, occupy or maintain any building ... pier dock ... or other structure or obstruction in any National Wildlife Refuge.

(Pls.' Mem. filed July 31, 1995 at 9) (emphasis in original).

Plaintiffs argue that "Title 50 CFR 27.92 fails to provide even a clue as to the guidelines to adhere to by the Department of Interior." (*Id.*)

Section 27.92, however, is simply meant to alert an individual about to undertake one of the listed activities that he or she must do so consistent with the rules and regulations which are operative within the Refuge. Congress has provided the United States Department of Interior with the authority to regulate such lands consistent with the legislative goals. *See* 16 U.S.C. § 668dd. Micro-management by Congress is not appropriate, if indeed possible, given the nature of the subject matter. Rather, broad discretion must be vested in those charged with administrative oversight.

The Court concludes that plaintiffs have not established the legitimacy of their argument that defendants' decision to deny them a permit deprived them of a property right without due process of law.

### 4. Defendants' Decision was not Arbitrary, Capricious or Unreasonable, Notwithstanding the Level of Development Within the Area

■ Plaintiffs contend that defendants' decision is not sustainable, given the development already within the Refuge, viewed in conjunction with the intensive usage found in the abutting properties and waterways. Against those points of reference, it is alleged that "no rational basis existed to deny plaintiffs the right to reconstruct a dock at their property in a manner that will affect the foreshore ecology in a minimal way." (Pls.' Mem. filed July 31, 1995 at 18.)

Plaintiffs are correct that considerable activity occurs within the Refuge. By way of example, defendants allow up to eight-hundred (800) boats to be moored within its boundaries. However, those moorings are outside of the intertidal zone, a critical nursery area for fish, as well as an escape area for fish and birds.

It is also true that portions of the bay bottom are dredged to recover oysters and other shellfish. The 1968 deed reserved to the Town of Oyster Bay the right to permit such activities after the conveyance if "not incompatible with the use of such lands for a migratory bird refuge and fish and wildlife purposes." (Pls.' Ex. 1 at 4, ¶ 4.) The commercial harvest of shell fish depends on high water quality, as explained by Clinton S. Smith, a former Harbor Master and Supervisor of Conservation and Waterways for the Town of Oyster Bay. The current viability of the Oyster Bay shell fishing industry strongly suggests that this use is not inconsistent with the purposes for which the Refuge was established. (Apr. 18, 1995 Tr. at 57–58, 93.) In any event, the shell fishing is not controlled by the defendants, but rather by the Town of Oyster Bay.

The Court has also considered the testimony of Harbor Master Smith, which detailed other types of development with the Refuge, together with the testimony of Roy L. Haje, a biologist and former employee of the New York State Department of Environmental Conservation and of the United States Fish and Wildlife Service, concerning his opinion

about the *de minimis* ecological effect that plaintiffs' dock would produce. However, that evidence is more than counterbalanced by defendants' proof on this point. Regional Director Kaufman testified that "[w]e look at the effect of all new activities in light of those that are already ongoing," (Apr. 19, 1995 Tr. at 164), a concept which plaintiffs' counsel calls "environmental tipping." (Pls.' Proposed Findings of Fact and Conclusions of Law at 8.) In sum, plaintiffs have not established that defendants' denial of their permit application was contrary to law, notwithstanding the existing development within the Refuge.

By denying plaintiffs a permit, defendants have placed them in essentially the same position as the approximately eight-hundred (800) boat owners who moor their vessels in deep water within the Refuge, some, if not many, of whom also own property abutting the mean high water mark of Oyster Bay Harbor. Plaintiffs, like them, are required to utilize a dingy to reach their moored vessel.

5. *The Policy Regarding a Special Use Permit for Docks Within the Oyster Bay National Wildlife Refuge is not Arbitrary, Capricious or Otherwise Unlawful Simply Because its Literal Reading Would Preclude the Reconstruction of a Dock Destroyed in a Storm*

■ Plaintiffs argue that the defendants' policy is patently void "since it would prohibit reconstruction of docks that might be destroyed in a storm." (Pls.' Mem. at 14 ¶ 24.) A literal reading of the policy supports the conclusion urged. However, although the issue was not pursued at the trial, it would seem that the purpose underlying the policy would not be compromised by permitting the reconstruction of a dock that was usable immediately prior to its sudden dismantlement through the ravages of nature. A common sense interpretation of the policy presumably would permit reconstruction. Be that as it may, however, plaintiffs' position is not within the purview of the proffered hypothetical scenario. A situation that may or may not happen to some other owner of property abutting the Refuge at some time in the future is not available to plaintiffs as a mechanism to invalidate the policy.

6. *The Special Use Permit Policy is not Arbitrary and Capricious as Being Inconsistently Applied by Defendants*

■ In an effort to show the unreasonableness of the challenged policy, plaintiffs cite situations of others within the Refuge, which it is claimed, differ from the treatment afforded to them by defendants.

As explained by Regional Director Kaufman:

> The philosophy for Oyster Bay specifically was that if there was an existing use, if there was a facility there at the time of the refuge that continued to be in use, that the government would allow those facilities to be repaired, but that new facilities would not be built within the refuge. That was based on Refuge Administration Act passed in 1966 and the policy statements written in 1972 and in 1989.

(Apr. 19, 1995 Tr. at 151.)

As evidenced by the above excerpt from the trial record, the challenged policy is not new. Yet, plaintiffs' counsel, a seasoned and highly accomplished litigator, was only able to cite three cases (which he uncovered through the Freedom of Information Act) in support of the claimed inconsistency in the policy's application.

■ Firstly, he cites the application of plaintiffs' neighbor, Charles Wang, who was granted a permit in or about 1990. However, there is no question that the Wang dock existed in 1968 and continued in essentially sound condition up to the time of application. (Apr. 18, 1995 Tr. at 41–43.) Plaintiffs argue, however, that the Wang dock was not "usable" at the time of application because "a dock that ends at one foot of water at mean low tide and is fifteen feet in the air is not currently usable." (Pls.' Mem. filed July 31, 1995 at 10.)

Mr. Stewart defines a dock as usable in a markedly different fashion than plaintiffs. To him, a structure is usable as of the date of application if it is structurally sound even if it does not extend to deep water at all tides. (Jan. 26, 1995 Tr. at 83.) Here, defendants

have the better side of the argument. By plaintiffs' narrow definition, a dock must be usable at all times to legitimately fall within the definition utilized by the Wildlife Service. While Oyster Bay Harbor is not the Bay of Fundy, it does have a difference between high and low tides in the range of seven and one-half feet. Under the circumstances, it is not unreasonable for defendants to define a usable dock as, *inter alia,* one which is currently capable of being used as such at some portion of a given day depending on the tide.

Mr. Wang's situation is significantly different than plaintiffs'. The Wang dock existed and was usable in both 1968 and at the time of application. In contrast, plaintiffs' dock was in existence in 1968 in the sense that a boat could be docked at a portion of the remanents of the old Blackton complex, but was non-existent at the time application was made. A few projecting remanents of timbers does not constitute a dock.

The next example of an alleged inconsistency pertains to Mr. Yampol's situation. He owns a small marina, which long predates the establishment of the Refuge. He has been permitted periodically to dredge from his marina to the deep waters of Oyster Bay Harbor. Plaintiffs claim that since the usability of the marina depends upon dredging, the defendants—by analogy to plaintiffs' situation—improperly issued him dredging permits.

Granted, the issuance of the permits to Yampol may be violative of the definition of "usable" employed by plaintiffs, but that does not necessarily mean that it is inconsistent with the definition used by defendants, who elected to treat the two dissimilar activities differently. In sum, plaintiffs have not established that the dredging permits issued to Yampol represent an inconsistent application of the policy under which they were denied permission to construct a pier and launching ramp.

Lastly, plaintiffs refer to the Sewanhaka Corinthian Yacht Club as another example of the alleged inconsistent treatment. Precisely what was done at that location, and when, is subject to dispute. The government maintains—absent any cite to the record—that the Yacht Club was simply allowed to "place a boat lift onto its existing dock structures." (Defs.' Proposed Findings of Fact and Conclusions of Law at 19.) However, during the cross examination of Harbor Master Smith by the government, he testified that an additional dock was added at that location "probably in the 80s somewhere." (Apr. 18, 1995 Tr. at 99.) In plaintiffs' memorandum of law, the proffer is made that the dock was constructed, pursuant to a Special Use Permit in 1971, *i.e.* one year prior to the formulation of the 1972 policy that no new docks would be authorized "in compliance with the reservation of the deed of donation." (Pls.' Mem. filed on July 31, 1995 at 14.)

In any event, defendants recognize that there have been some inconsistencies concerning structures within the Refuge. In fact, this was the reason the "Regional Director signed the 1989 Decision Document, to re-establish a consistent application of policy." (Pls.' Ex. 35 at 2.) However, plaintiffs have cited no example of an inconsistent application in a situation analogous to theirs, with the possible exception of a dock at the Sewanhaka Corinthian Yacht Club that would have been constructed sometime prior to the policy being updated in 1989.

Plaintiffs' proof fails to establish that the implementation of the challenged policy has been eviscerated by pervasive inconsistencies, thereby rendering its application in this case arbitrary, capricious and contrary to law.

## CONCLUSION

For the reasons above stated, and consistent with the Court's review function under 5 U.S.C. § 706, it is hereby directed that judgment be entered for defendants regarding all claims advanced by plaintiffs, and that the complaint in this action be dismissed with prejudice.

SO ORDERED.