Burt H. STUTCHIN and Cheryl
Stutchin, Plaintiffs,

v.

TOWN OF HUNTINGTON and
Incorporated Village of Lloyd
Harbor, Defendants.

No. CV983580 ADS.

United States District Court,
E.D. New York.

Sept. 28, 1999.

James F. Matthews, Huntington Town Attorney, Huntington, NY (Robert De Gregario, Special Assistant Town Attorney, Heidi Levine–Sorken, Assistant Town Attorney, of Counsel), for Town of Huntington.

Humes & Wagner, Locust Valley, NY (James A. Bradley, John Ritter, Jr., Linda S. Agnew, of Counsel), for Defendant Incorporated Village of Lloyd Harbor.

### MEMORANDUM DECISION AND ORDER

SPATT, District Judge.

This case involves the constitutionality of the Village of Lloyd Harbor Code which provides that docks in Lloyd Harbor shall be limited in length to seventy-five (75) feet seaward, and that in no event shall the seaward end of the dock extend beyond the point where the mean low water depth exceeds two (2) feet. This Village Code provision effectively prevents boats with a draft of two feet or more from being moored to any dock in the Village. The Court will also consider the constitutional attack on the Town of Huntington Code (the "Town") limiting the length of docks to 100 feet.

The Court notes that it will discuss two "Lloyd Harbors" in this decision. The first "Lloyd Harbor" is an incorporated village in Suffolk County and consists of land in the Village. The second is a narrow tidal body of water which emanates from Huntington Harbor, which is also known as "Lloyd Harbor." In this opinion, the Court will refer to the Village of Lloyd Harbor as the "Village." The Court will refer to the body of water adjacent to the plaintiffs' property as "Lloyd Harbor," also referred to as the "Inner Harbor." This body of water is also within the Incorporated Village of Lloyd Harbor.

The complaint of the plaintiffs Burt Stutchin and Cheryl Stutchin (the "Stutchins" or the "plaintiffs"), challenges the Village of Lloyd Harbor's denial of a permit to build a 115–foot dock behind their wa-

Burt Stutchin, Hempstead, NY, Pro Se.

terfront property to accommodate their 36–foot Trojan vessel. The complaint also attacks the Town Code provision limiting dock length to 100 feet.

The Court has waded through the sea of motion papers from the parties: (1) a motion to dismiss the Amended Verified Complaint ("the complaint") by the defendant Incorporated Village of Lloyd Harbor; (2) a motion to dismiss the complaint by the defendant Town of Huntington; (3) a motion for summary judgment by the married plaintiffs; and (4) a cross-motion by the Village, which the Town adopts in its entirety, for summary judgment dismissing the complaint, Rule 11 sanctions and attorneys' fees and costs. To assist the Court in deciding these motions, which raised issues of fact concerning, among other matters, the conditions present in Lloyd Harbor, the Court conducted a full-blown hearing.

As stated above, the plaintiffs' complaint flows from the Village's denial of their application for a permit to construct a 115–foot dock behind their waterfront property, in excess of the Village Code's maximum length. The plaintiffs raise various claims pursuant to 42 U.S.C. §§ 1983 and 1985, anchored in the state and federal constitutions. Specifically, the Stutchins contend that the Village's refusal to approve their application dampens their legal and constitutional rights to own and use their property and its riparian rights, constitutes a taking of their property for public use without just compensation, and violates their rights to due process and equal protection of the laws.

The plaintiffs' two causes of action are: first, a Section 1983 challenge to the constitutionality of the Village and Town Codes at issue, and second, a Section 1983 "taking" cause of action for monetary damages. The plaintiffs' complaint also dives into State law, contending that the designation of Lloyd Harbor as a Critical Environmental Area failed to comply with certain procedural requirements of New York Law. The defendants respond that the plaintiffs' claims do not hold water, because their claims are not ripe for review, and the local laws being challenged are constitutionally and legally sound.

During the hearing, the Court stated what it believed to be the most important principle in the determination of the constitutionality of Local Law 1 of 1992:

THE COURT: The defendant village wants to show that it had a legitimate governmental purpose in making the laws that it did. That is one of the important tests. Did the village have a legitimate governmental purpose that would override the inconvenience of you in using—in not being able to use your boat at the dock. Did they have a legitimate governmental purpose that would trump your inconvenience?

Tr. at 524.

## I. BACKGROUND

The undisputed facts in this case are as follows:

The plaintiffs own real property located on the southern shore of Lloyd Harbor, a body of water located entirely within the Village, which itself is located in the Town. The Village has designated Lloyd Harbor as a Critical Environmental Area, so that any action affecting Lloyd Harbor is a "Type I action" under the State Environmental Quality Review Act ("SEQRA"), N.Y.E.C.L. art. 8.

The Stutchins own a 36–foot Trojan motorboat which draws at least 3 feet of water at anchor. The plaintiffs have been mooring their boat in the stream in Lloyd Harbor, and must travel between the vessel and their property in a dinghy. They wish to build a dock 115 feet in length on their waterfront property to allow them more convenient access to their vessel.

On July 25, 1997, the Stutchins received a permit from the New York State Department of Environmental Conservation ("DEC") authorizing the construction and installation of a ramp and floating dock assembly, which stated that it was "contin-

gent upon strict compliance with ... all applicable regulations" and the "obtaining [of] any other permission, consent or approval from the ... local government which may be required." On or about September 4, 1997, the plaintiffs received a permit from the Army Corps of Engineers, which contained a similar proviso that "[t]his permit does not obviate the need to obtain other Federal, state or local authorizations required by law."

On or about February 4, 1998, the Stutchins applied to the Village for the required permit to construct a 115-foot dock adjacent to their property, with the expectation that their application would meet with smooth sailing. Their application ran aground, however, because Village of Lloyd Harbor Zoning Code § 205–104 B(1) allows only seasonal (April through October) floating docks in the district where the plaintiffs' residence is located, provided that the dock length does not exceed 75 feet and does not extend beyond the point where the mean low water depth exceeds 2 feet, whichever is closest to land. In or about January 1998, the Village denied the plaintiffs' permit application because their proposed dock assembly did not comply with the Village Code.

On or about January 26, 1998, the plaintiffs filed an appeal with the Village Board of Zoning Appeals, seeking a variance. As of August 20, 1999, the date of the closing arguments after the hearing, the plaintiffs' application for the variance was undecided and still pending before the Board of Zoning Appeals.

The plaintiffs have not yet applied for a permit from the Town of Huntington, another prerequisite to building the dock. Under Huntington Town Code § 137–22 D(4), the Town will not consider issuing a dock permit unless and until approval has been obtained from the Village. The Town Code provides that when the length of a proposed dock exceeds the 100–foot long maximum permitted under the Town

Code, the applicant must apply for a variance pursuant to Section 137–26 A(1) of the Town Code.

On May 13, 1998, the Stutchins launched this lawsuit and on June 23, 1998 filed the complaint at issue.

## II. THE ISSUE—The Constitutionality of the Village and Town Dock Zoning Codes

The plaintiffs contend that they are not required to pursue variances or to obtain final determinations on their applications for dock permits, because the Village and Town dock construction ordinances are "unconstitutional, illegal and invalid." In this regard, the plaintiffs assert that the ordinances "do not promote the health, safety, welfare or morals of the general public; are not enacted in furtherance of a comprehensive land use plan; are not rationally related to achieving a permissible municipal goal; and are arbitrary and capricious." The plaintiff Burt Stutchin, Esq., *pro se*, summarized his position in his opening statement, as follows:

> It's my contention, Judge, that there is no basis for the municipal regulation of the plaintiffs' riparian rights to the degree that they've imposed. As—Your Honor is obviously troubled by this two-foot limitation, as you rightfully should be, because it is a ridiculous limitation. And the intent of this limitation, whether the municipalities will admit it or not, is to preclude people from keeping any vessel larger than an inflatable raft or a dingy at a dock.

Tr. at 12.*

The question presented is whether the zoning ordinances in question here "bear[ ] anything other than a rational relationship to a legitimate government objective." *Orange Lake Associates, Inc. v. Kirkpatrick*, 21 F.3d 1214, 1225 (2d Cir.1994) (citing *Village of Belle Terre v. Boraas*, 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 [1974]; *Village of Euclid v. Ambler Realty*

* Tr. refers to the Hearing Transcript.

*Co.*, 272 U.S. 365, 395, 47 S.Ct. 114, 71 L.Ed. 303 [1926] [a property owner can challenge the constitutionality of a zoning restriction if it is "clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals or general welfare"]; *Greene v. Town of Blooming Grove*, 879 F.2d 1061, 1063–64 [2d Cir.1989] ). On the other hand, the defendants contend that the limitation of dock length around Lloyd Harbor, a narrow and environmentally critical area, is a legitimate goal based on safety and rational, legitimate municipal objectives. *See Orange Lake Associates, Inc. v. Kirkpatrick*, 21 F.3d 1214.

### III. *THE HEARING—FINDINGS OF FACT*

This opinion and order includes the Court's findings of fact and conclusions of law as required by Fed.R.Civ.P. 52(a). *See Rosen v. Siegel*, 106 F.3d 28, 32 (2d Cir.1997); *Colonial Exchange Ltd. Partnership v. Continental Casualty Co.*, 923 F.2d 257 (2d Cir.1991). During this discussion, the Court will make findings of fact, which will be supplemented by additional findings later in the opinion.

### A. *The Plaintiffs' Case*

Charles Hackeling is a former Councilman of the Town of Huntington and is presently the Presiding Officer of the Suffolk County Legislature. On April 14, 1993, while a member of the Huntington Town Board, Hackeling was the sponsor of Local Law 8–1993, Sections 137–22 and 137–26, regulating the length of private docks in the Town. This law was enacted to provide criteria and standards for erecting a dock in waters over Town-owned underwater land. Among the standards was a dock no longer than 100 feet. He stated that the Town Code provisions were enacted to promote the health, safety and welfare of the community.

Also, Hackeling stated that with few exceptions, the Town is the fee owner of the lands under the water in the bays to the mean high waterline. The land above the high waterline is, for the most part, privately owned. Riparian owners have the right to reasonable access to the water which included the right to construct a dock.

According to Hackeling, the Town is the owner of the land under the water in the bays up to the "mean high tide." Asked by the Court to explain "mean high tide," Hackeling responded as follows:

> THE COURT: So average mean high tide means what? And we know what high tide is.
>
> THE WITNESS: It's my understanding, Judge, you take an annualized—it's an average. Basically—
>
> THE COURT: Average of where the high tide goes?
>
> THE WITNESS: Correct.
>
> THE COURT: For example, suppose the high tide goes up ten feet on the beach at most, but sometimes it only goes five feet on the beach. So it would be—seven and a half feet would be mean high tide?
>
> THE WITNESS: Correct, Judge.

Tr. at 35.

Hackeling explained that, under the Town law, a homeowner had the right to a dock that extended from the point of mean high tide, for a distance of 100 feet into the Bay:

> THE WITNESS: You have as of right, a right to a 100–foot dock under the Town law.
>
> THE COURT: Now, 100 feet from the beach, from the land out into the water?
>
> THE WITNESS: From the mean high tide out into the water.
>
> THE COURT: Okay. One hundred feet is from mean high tide, which we just talked about, right?
>
> THE WITNESS: Correct.
>
> THE COURT: Of the seven and a half feet on the beach?
>
> THE WITNESS: Correct, Judge.

THE COURT: One hundred feet out to sea, out to the bay?

THE WITNESS: Correct. If you wanted—that you got as of right. You just filed your papers with the building department. If you wanted a longer dock, you would then appeal to the Town board.

Tr. at 36.

In reaching this 100–foot length determination, the Town relied on recommendations from "assorted Town employees, the Harbor Master's Office, planning directors and DEC people" and, "it is just a number they recommended which, after public hearings, sounded reasonable" to Hackeling, "so that the docks don't run all the way across the harbor" and yet, "people could get access to the water." As stated above, under this Town Code provision, every person was permitted to build a 100–foot dock, and could appeal to the Town Board for permission to build a longer dock. He explained the rationale for restricting docks in a narrow waterway such as Huntington Harbor, as follows:

Q   Can you tell me was the regulation enacted to promote the safety of the general public?

A   I would safely say it was.

Q   Can you describe in what sense that does that or accomplishes that goal?

A   Well, there's an inherent safety aspect with regard to, especially if you look in a congested narrow harbor like Huntington Harbor, clearly docks have to be regulated in some way, shape or form.

Individual people can't decide since putting a dock not on their own property, that in their opinion they would like a dock all the way across the harbor. So by protecting the navigable waterways you are helping the safety of the populous.

Tr. at 75–76.

A crucial element in this case is the narrow width of the water in the inner harbor of Lloyd Harbor. In this regard, Hackeling testified as follows:

Q   Do you know what the width of Huntington Harbor is, sir?

A   I would estimate at the head, probably half a mile and at the base of it, a mile, maybe three-quarters of a mile.

Q   And that would be somewhere between 2,500 and 3,500 feet; is that right?

A   Well, you have to understand it has nooks and crannies. There are all kinds of legal challenges where when a riparian owner if he takes his dock out at a 90 degree angle and another takes his out at a 90 degree angle, they will actually hit each other (indicating).

Tr. at 76.

Hackeling testified that an applicant must obtain a Village permit prior to making application for a Town permit. Unlike the Village, the Town has no depth requirement.

Roger T. Hawke has been a Village Trustee of the Incorporated Village of Lloyd Harbor for approximately 15 years. Asked about the average width of the waters of Lloyd Harbor, Hawke's best approximation was "a few hundred yards across … a fairly narrow body of water." (Tr. at 97).

Hawke explained that a "coastal overlay district" ("COD") is one that is created and superimposed over the existing zoning areas for the purpose of establishing certain regulations of waterfront areas in critical environmental locations. Coastal Overlay District Number 1 ("COD1") covers the inner area of Lloyd Harbor and another body of water called Puppies Cove. The plaintiffs' residence and dock area is in COD1. The reason for two CODs is that the inner harbor and Puppies Cove "were more sensitive ecological areas and required more protection than areas in the other parts of the coastline." The other areas were placed in COD2 because "it was felt most areas weren't as fragile ecologically and, therefore, the regulations of

those areas could be a little less stringent, perhaps." (Tr. at 102).

The CODs regulated docks and "any kind of construction in the overlay district ... it governed other structures as well." The following testimony by Hawke is material in the determination of the constitutionality of the Village Code at issue:

Q  Well then, sir, what was the primary purpose of the formation of the Coastal Overlay District Number 1 in your opinion?

A  *I think the primary purpose was to preserve the sensitive ecological balance in the inner harbor.* It is an area which requires protection. It's a very sensitive ecological environment and it was felt that it needed protection. At that time when we first started considering these regulations in the harbor which was set back in 1990 there were a number of applications by people who wanted to build piers and docks in the harbor and we felt that we had to take a look at this and regulate it.

Tr. at 102–03 (emphasis added).

The dock regulation in COD2 is 100 feet in length or to where the low mean water depth is 3 feet; which is less restrictive than the 75–foot long and 2–foot depth mandated in COD1. The reason for this is based on the ecological differences between the two CODs. The Inner Harbor (COD1) is an area where there are "all kinds of plant growth, fish and shellfish." Hawke testified that studies were made of the ecological conditions and consultants were hired to advise the Trustees on this subject, and the Inner Harbor was found to be a very sensitive area. The areas in COD2, namely, the shoreline facing the harbor and the sound, did not have that kind of sensitive environment. Also, in COD1, there is a requirement for floating docks which had to be removed during the winter months to keep the harbor clear during inclement weather and ice storms.

The initial draft of the Village Code banned all docks in COD1. The Local Law

at issue is Local Law 1–1992 and was filed with the Village Secretary on April 28, 1992. There was a moratorium enacted in mid–1990 in effect until the enactment of the local law at issue in 1992 while the Trustees studied the effect of docks and other construction in the critical environmental areas. The moratorium temporarily prohibited any construction "in the critical environmental area which ... covered up to 200 feet inland from the shore land." This moratorium was adopted in response to a proliferation of docks in the harbor. At that point, public hearings were held.

In regard to the 75–foot dock length and 2–foot water depth restriction, the Trustees relied upon the Village Planning Board, which did the ground work, the investigation, and considered expert advice and consultation. However, Hawke conceded that the Board of Trustees did not have the benefit of any expert testimony when it considered the enactment of the dock limitations. Hawke explained that the Board started with the proposition that there should be no docks in the Inner Harbor. After a public hearing, the Board first considered a 50–foot length. A committee was appointed to study the situation. Significantly, Hawke testified that "we were looking for a ... dock length ... that would give access to enough water so that a dingy could be put into the water and (the resident) could use the dingy to get to the boat (moored in the harbor)." Further, Hawke stated that the 2–foot depth was at low tide and "during the rest of the day ... there would be sufficient water ... for the boat owner to bring the boat up to the dock." (Tr. at 126–27).

As to the rationale for this restrictive code provision, Hawke testified that the Trustees were concerned that if "everyone could build a dock ... to accommodate any size boat he wanted, then we would have projections out of the harbor that would totally destroy what we were trying to achieve in protecting the harbor ... we felt if every owner of property along Lloyd Harbor could build a 150 or 200–foot pier

into the harbor it would destroy the harbor [and] destroy ecology of the harbor [in the] very sensitive ecological area." (Tr. at 127–28).

However, while Hawke testified that he could not produce a written study used by the members of the Board, their conclusions were reached after consultations with experts in ecological matters and, in part, based on information conveyed to them by the Planning Board. The Board also relied on the information gleaned at public hearings during which "a lot of boat owners ... agreed we should have some restrictions." The Board determined "what length of dock would be necessary to get the boat owner to a point where he had access to his boat ... and 75 feet or two feet of water ... during these two or three hours of the day when you could not dock at the ... pier, ... 75 feet would take him to a depth of water which would enable him to launch a dingy to get to the boat." (Tr. at 131).

Hawke insisted that this was a proper compromise between no docks at all and the system in place where large boat owners would be compelled to shuttle their boats twice daily during the low tides, between a 75–foot dock and a mooring in the harbor.

Asked to produce concrete "evidence" as to the need to inconvenience boat owners in this manner, Hawke responded:

> [I]t wasn't the object of this legislation to create inconveniences. That was not our purpose. Our purpose was to protect the harbor, to protect the ecology and the sensitive and fragile environment of the harbor. We felt if everyone was allowed to put any length dock no matter how long he wanted, to put as big a boat he wanted at a dock, that would have a deleterious effect on this inner harbor, and that's why the regulation was imposed. It wasn't imposed just to make it burdensome for boat owners. That wasn't the object of the legislation.

Tr. at 132–33.

However, Hawke readily admitted that the Code does impose a burden on boat owners, which any kind of restrictive regulation would do. Nor could Hawke explain why limiting docks to 75 feet could protect the ecology of the harbor. Also, he stated that the boats would necessarily have to be moored to a buoy or a float, secured by an anchor in the harbor. Hawke does not know if these mooring buoys, which are anchored to the bottom, are more of an environmental concern than the docks.

The plaintiffs reside in the western portion of the Inner Harbor, where the area is more ecologically sensitive and fragile than the other portions of the harbor. Fishing, clamming and setting lobster traps is allowed in the western portion.

The Local Waterfront Revitalization Plan for the Village ("LWRP") states that:

> The Board of Trustees' control of underwater lands titled in its name is subject to the riparian rights of private individuals who own waterfront property and who have the right to access and use the waters adjacent to their private property. In general, the littoral owner has the right to build a dock, or "wharf out" to a point of navigability *subject to* reasonable regulations to preserve the public's right of passage, use, safety, and scenic views.

(Plf.Ex. 6) (emphasis added).

Cynthia Kendall Morrongiello has been a Village Trustee from 1983. She voted to approve Local Law 1–1992. She added some cogent facts underlying the purpose of the legislation at issue. Morrongiello testified that "[W]e have a very lovely harbor ... that is very special for a number of reasons." She said that "environmentally it is [a] very fragile area. It is replete with waterborne animals and plants. It's a great shell fishing area ... there are waterfowl that [are] native to the area and it is a wintering-over place for

many birds." (Tr. at 178). Significantly, she stated that the harbor is very fragile "because it comprises some 800 or so acres of surface and it is only an average depth of about five or six feet." She explained that because the Inner Harbor is a relatively small, narrow and shallow body of water, and that "anything that happens in that harbor, therefore is proportionally going to have quite a large impact on the harbor itself... So our concern with this legislation was to try to preserve those qualities that make the harbor a very desirable place." (Tr. at 178–79).

Morrongiello related the background prior to the enactment of Local Law 1–1992. Residents began to apply to build docks extending into the harbor. Five or six dock applications were received. In 1991, a moratorium was placed on dock construction so that the Board could study the situation and consult with experts about the ecology and the environmental concerns. Apparently, some residents wanted long docks and were not concerned with the ecology. The Planning Board headed the investigation and the Board received reports from that body. Morrongiello believed that Clark Associates was one of the expert firms consulted.

The Clark Study concluded that any dock in the harbor had an impact on the ecology with regard to cutting light off in portions of the floor of the harbor and in other respects. According to Morrongiello, the total impact of the report would be to have the least amount of disturbance to the ecology in the harbor and yet, to allow residents to have access to the harbor.

In her study of the subject, Morrongiello was not really concerned with the length of the dock, but with any intrusion to the environmentally critical area of the Inner Harbor. Asked how the Trustees arrived at the 75–foot length and 2–foot depth at low mean water limitation, she stated:

> This local law went through a series of permutations. The original intent was to see if perhaps it wouldn't be a good idea to ban all docks. We had hearings on that. We then decided it wouldn't be in the best interests of the members of the community, specifically people who did own property at the edge of Lloyd Harbor, to put a total ban on docks. And, therefore, we sought ways to move toward the sort of the least intrusive type and/or if you want to say "length" okay, but moving towards the least— things that would least intrude on the environment of Lloyd Harbor.

Tr. at 189–90.

Morrongiello conceded that the result of the Local Law was to compel residents to keep their larger boats at moorings rather than at the docks, which would involve transportation by a dingy to and from the larger boats moored in the harbor. With small children, this would also involve their transportation in this manner, an additional safety problem.

Joseph Enrico is President of an environmental consulting firm and an expert in the fields of coastal marine habitats and wetland environments. He also obtains permits in marine environments. Enrico was retained by the plaintiffs in early 1997 to obtain permits for their dock in Lloyd Harbor to enable them to use their 36–foot Trojan vessel which, when empty, draws $3\frac{1}{2}$ feet of water. In the harbor, the average tidal range is $7\frac{1}{2}$ feet in elevation from low to high tide two times a day, and 100 feet in horizontal distance. The plaintiffs' property included 200 feet of beach frontage on the harbor.

In Enrico's opinion, the plaintiffs' vessel would require a dock of 115 feet in length to safely moor it at the dock for 24 hours at all tidal stages. The parties stipulated that a 75–foot dock would not accommodate the plaintiffs' boat.

Enrico prepared a site plan for a proposed dock at plaintiffs' home (Plf.Ex. 8). In this document, he described the width of Lloyd Harbor as 500 to 600 feet. Questioned about this, Enrico stated that he was "in error because on review of the charts for the Lloyd Harbor area, the ac-

tual correct distance is about 1200 feet." On cross-examination, Enrico was questioned closely about the width of Lloyd Harbor at or near the point where the Stutchin dock would be located. He stated that on mean high water on both sides, when there is the most water in the harbor, it is 1200 feet across. However, on mean low water on both sides, the width of the harbor "is approximately 1000 feet, give or take 100 feet on either side." The Court notes that the width of the harbor is a material issue in this case.

Even assuming the width from land to land at low tide is 1000 feet, we are dealing with a very narrow body of water. Placing any obstruction into such a narrow navigable waterway should be approached with caution. Photographs of the harbor taken from the Stutchin residence (Plf.Ex. 9) show the pristine nature of the entire area and waterway, and also the narrow body of water between the land on each side.

On behalf of the plaintiffs, Enrico applied for approval of the proposed dock to the United States Corps of Engineers, the New York State Department of State and the New York State Department of Environmental Conservation ("DEC"). On September 4, 1997, the Corps of Engineers issued a permit for the construction of a floating dock 115 feet long (Plf.Ex. 10). Enrico testified that, in his opinion, the issuance of this permit means that the dock structure does not have an effect on navigation. Further, Enrico testified that the Corps of Engineers "would allow a greater width of the waterway (and) would conceivably allow ... a 200–dock to be installed at the Stutchin residence and not impede navigation." (Tr. at 239). However, the Corps of Engineers' permit expressly states that "this permit does not obviate the need to obtain other Federal, State or local authorizations required by law."

Also in evidence is the DEC permit, dated July 21, 1997, to expire July 31, 2000 (Plf.Ex. 11). Enrico testified that the issuance of the DEC permit certifies that the proposed action complies with the interests of the Tidal Wetland Law "to preserve and protect and enhance tidal wetlands within the State of New York." However, the DEC permit also contains the following conditions:

8. The permittee is responsible for obtaining any other permits, approvals, lands, easements and rights-of-way that may be required for this project.

.     .     .     .     .

11. Granting of this permit does not relieve the applicant of the responsibility of obtaining any other permission, consent or approval from the U.S. Army Corps of Engineers, U.S. Coast Guard, New York State Office of General Services or local government which may be required.

Another document introduced through Enrico is a "coastal consistency letter" from the New York Department of State, dated June 11, 1997 (Plf.Ex. 13). Enrico stated that this document certifies that the Stutchin project is in accordance with the State's policies on coastal development. This certification also contains the following disclaimer: "The concurrence is without prejudice to, and does not obviate the need to obtain all other applicable licenses, permits, and approvals required under existing State statutes."

After receiving the Corps of Engineers and DEC permits, Enrico applied to the Village for a permit to construct the dock. By letter dated January 5, 1998, the plaintiffs' application was denied on the ground that the proposed dock construction did not comply with its 75–foot length, 2–foot deep regulation.

Enrico described the characteristics in the harbor. Surprisingly, the water in the harbor is relatively shallow; the average depth in the Inner Harbor is about 5 feet. The total area in the harbor is approximately 600 acres. There are docks scattered throughout the harbor. Three docks are within the immediate vicinity of the Stutchin residence. One dock is owned by

the Mill Pond Association. It is a floating dock. Enrico stated that these floating docks "are impacting the wetlands ... in that they are basically tearing up the bottom because of the ... tides." Enrico measured the docks in the immediate vicinity of the Stutchin residence and the proposed Stutchin dock of 115 feet is the shortest of the four docks; the Mill Pond Association dock being 138 feet, and each of the other two docks are 121 feet in length.

However, Enrico did not ascertain when these docks were constructed; if permits had been issued for the docks; or if they were lawfully constructed at the time they were built. Also, it was established that Stutchin is a member of the Mill Pond Association, and that the Association dock is approximately 50 to 70 feet from the plaintiffs' property. Surprisingly, even the Mill Pond Association dock which is 138 feet in length and 23 feet longer than the plaintiffs' proposed 115–foot dock, is not long enough to accommodate the plaintiffs' 36–foot Trojan.

Enrico testified that the moorings in the harbor are tied to anchors which sometimes weigh as much as 400 pounds and they are attached by a length of chain. He stated that the moorings are "navigational nightmares," especially at night. In addition, the anchors and chains scrape and cause damage to the bottom. The proposed Stutchin seasonal floating dock would not have anchors and would not damage the bay bottom and would have less impact on navigation. According to Enrico, the impact of the dock is not measured by its length but whether it rests on the bottom. Also, of course, the 75–foot long, 2–foot deep restriction compels additional boats to be used.

As to aesthetics, Enrico stated that there is no real difference between a 75–foot and 115–foot dock, because there are already several longer docks existing in the nearby water. Also, according to Enrico, there is no empirical data to support the contention that seasonal floating docks

longer than 75 feet adversely affect the fish, waterfowl or vegetation. Further, docks and pilings act as a harbor for small fish and crabs and snails. A United States Department of Commerce study seems to support Enrico's opinions.

Moreover, Enrico stated "that there is no rational basis for limiting the length of a dock per se because it really does not relate to the environmental effect" and does not hinder navigation. (Tr. at 283). Further, Enrico stated the obvious, namely, that only a small vessel could dock at a floating structure in 2 feet of water. It would be easier and safer for children and handicapped persons to board the vessel at the dock rather than taking a dingy to a mooring in the harbor.

Enrico agreed that Lloyd Harbor is designated by the New York Department of State as a significant fishing and wildlife habitat. He amplified this description, as follows:

Q What was the significance of that designation?

A Well, the significance of the designation signifies that that area is a *unique shallow embayment on the North Shore of Long Island.* The North Shore of Long Island is typified by bluffs and sharp rising cliffs and there are several embayments that are located along the North Shore.

Tr. at 294 (emphasis added).

Further, Enrico testified that Lloyd Harbor is a waterfowl watering and feeding area; a habitat for wading birds and raptors; a nursery and feeding habitat for commercially and recreationally important marine fish species; an important location for recreational activities for residents of the Village; and an important shell fishing location.

In sum, Enrico testified that the Local Law at issue was not based on a rational basis because a 115–foot dock rather than a 75–foot dock would not increase the environmental damage; would not impede navigation; would compel the use of additional

boats; would compel the use of mooring buoys which would do more ecological damage; and would increase the risk of transferring children, elderly and infirm persons. In fact, he stated that there was no correlation between the length of the dock or the depth of the water near the dock, to the damage to the wildlife in the harbor.

Aram Terchunian is the President of an environment consulting firm who testified on behalf of the plaintiffs. He is an expert in wetland environmental service and the permitting process for coastal structures. He does not know any other waterfront municipal regulation that limits docks to a length of 75 feet and a depth of 2 feet of water. The New York State DEC usually uses water depth of 3 to 4 feet. As to dock length, Terchunian stated the following:

Q   Is there any dock length restriction?
A   It is typically decided on a case by case basis based upon the slope of the under water land and how long it takes to get to reasonable water depth and the width of the water body.

Dock length is typically anywhere between—restricted from anywhere between 25 to 30 percent of the width of a water body. Or restricted based on the presence of a navigation channel. In which case on a case by case basis it is separated from the navigation channel by what is considered to be a reasonable and appropriate distance.

Tr. at 353.

Terchunian also testified that he reviewed the Village Draft Generic Environmental Impact Statement ("GEIS") (Plf.Ex. 3) and it contains no scientific study that concluded "that private docks lead to environmental consequences." Also, he is not aware of any scientific study that concludes that docks cause any adverse environmental consequences to water quality, fish or wildlife. To the contrary, floating docks are generally "benign in the environment containing both minor environmental impacts, and minor environ-

mental benefits" (Tr. at 360). Further, in his opinion, there would be no environmental consequences for a floating dock in excess of 75 feet in length and no more than 2 feet of depth water.

According to Terchunian, even though COD2 has a requirement of 100 feet in length and 3 feet in depth, "there is no ecological basis of distinguishing between the two coastal overlay districts." (Tr. at 368.) Further, he testified that mooring chains and anchors can have a significant impact on the bottom of the harbor as the moored boats swing in a 360 degree radius due to changes in both the winds and the tides. In his view, a seasonal floating dock which is not interfering with a specific navigation channel would have less impact on navigation than a series of mooring floats. In addition, Terchunian testified that seasonal floating docks have minor but positive benefits in that barnacles and algae encrust and grow on their bottom. Algae produces energy, and is fed upon by fish and crabs.

Terchunian confirmed that the length of the Lloyd Harbor coastline is 22 miles and the average depth of the water is 5 feet at low water. Also, the tidal range, namely, the difference between high and low water, is 7.4 feet. The approximate area of Lloyd Harbor is 600 to 800 acres, and the width of the water from the south to the north coast, at or near the Stutchin residence, "is over a thousand feet."

The proposed Stutchin dock is between two existing docks. Each of these docks is longer than the proposed Stutchin dock. In the opinion of Terchunian, the proposed 115–foot Stutchin dock would not have any impact on navigation, especially because the two adjoining docks are longer in length and the water is so shallow as to preclude navigable boat movement. There are already 40 docks in Lloyd Harbor (see Plf. Ex. 4), which have an average length of 127 feet.

Significantly, Terchunian testified that, in his opinion, the Village Code at issue is

not rationally related in any manner to the objective of reducing the number of docks, because it expressly permits the building of 75–foot docks. Also, the docks would not constitute a hazard given the width of the channel. Not only would the Local Law not reduce the number of boats in the harbor, but it would actually increase the number in that each owner would be required to have two boats. He also testified that the length of the docks is not related to the health and welfare of the residents or to benefit of the environment.

According to Terchunian no other village on Long Island regulates the depth to which docks can extend. Also, the New York State DEC does not have a depth of water standard. However, some of the towns in Suffolk County do have depth of water standards, as follows:

| | |
|---|---|
| Brookhaven | 3 feet |
| East Hampton | 3 feet |
| Shelter Island | 4 feet |
| Southampton | 2½ feet |

Interestingly, the Town of Southold Code does not have depth standards but states that the dock shall not adversely affect navigation or change the flow of tidal waters. In Nassau County, the Town of Oyster Bay Code has no depth standard and states that their object is balanced, reasonable access to waters in and with the general safety and convenience of the public. Thus, it appears that only the Village of Lloyd Harbor has a 2 foot depth requirement.

## B. *The Defendants' Case*

The sole witness on behalf of the defendants was Steven C. Resler, who the Village subpoenaed and testified over the better part of four days. Resler is employed by the New York State Department of State, Division of Coastal Resources, based in Albany. His official title is Supervisor of Consistency Review and Analysis. The Court found Resler to be a fair and credible witness. His experience in the field of environment relevant to the issues in this case, is considerable:

A [In] my present position I am responsible for the statewide supervision of the implementation of the New York coastal management program through the review of federal, state and certain local governmental activities consistent with the New York coastal program.

I am a member of the supervisor[y] staff. I direct and supervise a range of people with titles called coastal resources specialists, environmental analyst, planners—I supervise biologists, planners, geologists, landscape architects, and others with backgrounds in natural resource management or comprehensive planning.

My position is in the professional scientific and technical service class of civil service. I achieved my position through comprehensive civil service testing and evaluations of my education, experience, knowledge, skills and abilities.

One of my primary duties to work in the division under the direction of the Secretary of State is the overall administration and management of the coastal management program and local waterfront revitalization programs components of that program.

Tr. at 506.

Resler's experience in coastal wetlands and related subjects is extensive. He was formerly an environmental analyst for the State of New York and the Town of Smithtown; Senior Resource Technician with the New York State DEC; member of a municipal planning board; an investigator in marine field research collecting data relating to biological resources; a Harbor Master for the Town of Smithtown; and a Bay Constable for the same town.

Resler specializes in the subjects relevant to this proceeding:

I specialize in the development of comprehensive coastal management programs, Local Waterfront Revitalization Programs as components of coastal man-

agement programs, comprehensive lands and water use planning as components for the state coastal management program. I have extensive experience in analyzing conditions in the coastal area in developing the means to implement management of that area and its resources through the development of laws, regulations, and physical projects. Tr. at 509.

Resler explained the relationship between the New York State Coastal Management Program and the Local Waterfront Revitalization Program ("LWRP"). The Coastal Management Program provided incentives to local governments to participate with the state in coastal management through the development of local waterfront revitalization programs, which are comprehensive land and water programs and plans for the coastal areas of the municipalities. The LWRP is approved by the Secretary of State as an amendment to New York's coastal management program, and, in effect, becomes the policies and standards of the local government, the State of New York and the federal government. By such an LWRP, the Village contends that its goals are consistent with state and federal policy.

It was part of Resler's duties to assist local municipalities in the development of their LWRP. In this regard, he worked with the Village of Lloyd Harbor, starting in January 1988. Resler provided technical assistance to Lloyd Harbor and became familiar with its waterfront and water conditions. Resler described Lloyd Harbor as a "relatively shallow, narrow, high value water body surrounded to a large extent by very high value vegetative tidal wetlands." (Tr. at 516). The tidal height range is just under 7½ feet. Of importance, he stated that Lloyd Harbor "has such high value that it is a state designated significant coastal fish and wildlife habitat." That is accorded status as a special area designation by the State. Resler stated, "There are extensive vegetative wetlands surrounding much of Lloyd Har-

bor, especially the more narrow eastern most extent of the harbor." (Tr. at 517). These extensive vegetative wetlands are composed primarily of Spartina Alterniflora, which grows primarily between mean high and mean low water. Also, there is Spartina patens in the shallow mud flats and shoal areas. These latter vegetative growths "are of a very high value in an ecosystem ... much more sensitive to disturbance than deeper areas far off shore." (Tr. at 518). This vegetation is also one of the primary components of the fishing life habitat.

In particular, he described the area where the plaintiffs propose to place their dock as a relatively shallow area with the shore consisting of vegetative tidal wetlands:

> THE WITNESS: They are salt marsh cord grass. It is the common grassy vegetation you see when you look out in the Great South Bay and the North Shore embankments. The area is somewhat seaward of mean low water, and I will make it clear that the Spartina Alterniflora grows primarily between mean high and mean low water.
>
> The area seaward of the Alterniflora in the area where Mr. Stutchin proposes to build this dock also consists of mud and shoals. Those areas are extremely productive as tidal wetlands in Lloyd Harbor and they are an essential component of the Lloyd Harbor significant coastal wildlife habitat, which is a formal designation of the water body known as Lloyd Harbor, as an especially significant area because of its natural resources, qualities and values.

Tr. at 579.

The local governments were granted the authority by the State to regulate structures over water. Resler provided technical assistance and advice to the Village on the development of its COD1 and the dock regulations contained in that program. He is familiar with the legislative findings made by the Village Board of Trustees

when it enacted Local Law 1 of 1992. Resler stated that the various .statutes attempted to resolve the problem relating to structures in the water and the uses associated with them. With regard to COD1 and its dock restrictions, Resler worked with the Village officials in developing these regulations. In his opinion, these regulations further the federal and state interests, and are a refinement of such policy.

Resler discussed the Corps of Engineers and New York DEC permits issued to the plaintiffs and stated the obvious, namely, that these permits do not obviate the need to obtain authorization from the Village. However, Resler conceded that the issuance of the New York DEC permit signifies that the plaintiffs' dock is compatible with the New York Tidal Wetlands Act.

On May 27, 1997, the New York Secretary of State approved the LWRP of the Village. From that point in time, all the decisions of the state agencies were required to be consistent with the LWRP of the Village. Resler testified that the plaintiffs' proposed dock does not comply with the Village's LWRP because it exceeds 75 feet in length and exceeds the standard in that it extended beyond the prescribed depth of 2 feet of water.

Resler offered alternatives to the plaintiffs' proposed dock to more safely secure and unload passengers that would be consistent with the Village's LWRP. During this testimony, the Court questioned the witness on an important part of this case, namely, the obvious inconvenience of getting to the plaintiffs' boat moored in the harbor, which, as expressed several times, is a main concern of the Court:

Q Mr. Resler, are there any alternatives to the plaintiff's proposed dock that they could use to more safely secure and unload passengers in means that would be consistent with the Village's LWRP?

A Yes, there are several.

Q What are they?

A The vessel could be moored further off shore towards the eastern most extent of Lloyd Harbor where the water is deeper, where a sufficient weight mushroom anchor could be used with mooring tackle so that the vessel will remain free and clear of the shoreline in shallow waters during storming events, and he could use that *vessel and take it to another dock in the harbor during low tied [sic] that is longer, such as an association dock in the area to load and unload passengers. He could take that vessel from the mooring to any public or private marina in Huntington Harbor, Centerport Harbor, Northport Harbor and load · and unload passengers and gear there.*

Those are examples of alternatives.

THE COURT: You mean if you own waterfront property, you have to have your boat anchored or moored in the middle or some distance off shore.

How do you get to this boat?

.     .     .     .     .

THE COURT: He should have a different boat, is that what you mean?

THE WITNESS: Perhaps. He doesn't have to do that. *That is his choice, Judge.*

.     .     .     .     .

THE COURT: Why should he have to take it to another dock?

THE WITNESS: If Mr. Stutchin is looking to secure his vessel safely and to load and unload passengers and gear safely, the alternatives that I am identifying here are safer than trying to secure or securing a 36 foot long vessel to the dock that Mr. Stutchin has proposed.

If he were to secure a 36 foot vessel to the 115 foot dock that according to these plans reaches a depth of approximately four foot of water, on an average tide with a depth of four to five feet and a draft of a vessel of three and a half feet, he will only have 6 inches of distance

from the bottom of his vessel and substrate.

If the wind comes up and he has waves or if he loads the boat or puts the boat in gear such as if the rear of the vessel digs in when the propeller bites, he is going to bottom out. He is going to hit bottom.

If a wind and a storm comes up, his boat would be secured to a dock where the boat will cause or is likely to cause damage to the dock as well as itself banging against the dock, rather than swinging freely on mooring offshore where there are the sufficient depths of the water so the boat doesn't hit the bottom or cause damage to another vessel or itself. It's common knowledge and common practice that when a storm comes up you move the vessel away from those types of structures.

.    .    .    .    .

THE WITNESS: *What I meant by another dock was one of the association docks near where Mr. Stutchin lives, which is longer than 75 feet long and goes to a depth of water greater than two feet.*

THE COURT: I understand.

THE WITNESS: I believe a lot or two away from Mr. Stutchin's lot.

Tr. at 607–11 (emphasis added).

In an important part of his testimony, Resler was asked to state his opinion as to the effect of the dock proposed by the plaintiffs on the navigation and natural resources in Lloyd Harbor. He stated that the dock would be a physical obstruction in the area seaward of mean high water and would adversely affect navigation; it would affect vegetated and unvegetated tidal wetlands; it would affect the salt marsh in the area; the dock would shade the growing vegetation; the pilings would cause a physical disturbance to the vegetation; there would be changes in the composition of the area; and organisms that rely on sunlight would be adversely affected.

Also, the propeller of the plaintiffs' 36–foot boat, drawing approximately 3½ feet of water would blow segments from the bottom and cause a plume of mud behind the vessel. The shallower the water, the more disturbance to the bottom, and that would be accentuated in the shallow waters of Lloyd Harbor. In such shallow water, the plaintiffs' boat would "sit on the bottom in low tide and ... physically destroy whatever organisms are underneath it" (Tr. at 617). Resler emphasized that the more sensitive area of Lloyd Harbor is near the shore, the most vegetation productive portion of Lloyd Harbor. The problem, according to Resler, is the size and draft of the plaintiffs' vessel in such an extremely shallow and narrow body of water.

Resler's department studied the impact of docks in the preparation of the Coastal Management Program, from 1988 through 1998. He stated that docks have an adverse effect on navigation and natural resources, especially docks in excess of 100 feet. "The longer the dock, the greater ... the effects. These effects are magnified exponentially." (Tr. at 628).

The state SEQRA finding and New York Secretary of State approval with regard to the Village LWRP (Def. Exs. F and G) highlight the precious natural resources of Lloyd Harbor. The findings in these documents demonstrate that the Village dock program is proper "given the unique characteristics and circumstances in Lloyd Harbor." Addressing an important consideration, in this constitutional review, Resler described Lloyd Harbor:

Q   What are those unique circumstances?

A   That the water body known as Lloyd Harbor is a *state designated significant coastal water life habitat. That it is shallow, narrow, of state wide importance.* That it is generally or relatively undeveloped. That traditionally uses, meaning uses that have been taking place in that water for several decades past and the use of that water body now

are to be maintained in order to maintain, protect and preserve the existing natural resource character and values and development pattern and uses of that water body.

Tr. at p. 634 (emphasis added).

The United States Department of Commerce issued a pamphlet entitled "Biological Impacts of Minor Shoreline Structures on the Coastal Environment: State of the Art Review. Volume 1" (Plf.Ex. 18). This publication, recognized as authoritative by Resler and also by the Court, contained some relevant and important information:

*Summary of Physical and Biological Impacts*

*Construction effects.* Construction causes increased turbidity and sedimentation which, depending on severity, may reduce primary productivity, interfere with respiration of fish, alter the suitability of spawning areas, reduce bottom habitat diversity, and smother benthic organisms (Carstea et al.1975b). Resuspended bottom sediments may release toxic substances. Noise and vibration, along with turbidity, may temporarily drive fish or invertebrates from the area or cause behavioral modifications. However, in some instances fishes have been attracted to construction sites due to the suspension of benthic organisms.

*Chronic effects.* Docks and piers can cause navigational problems and interfere with public use of the water. Conflicts may arise concerning adjacent land uses and area aesthetics. In areas where longshore currents, tides and littoral transport are influential, floating piers can alter beach sand rovement patterns (Coastal Plains Center for Marine Development Service 1973).

. . . . .

But it should also be noted that piling and piers offer substrate for algae growth in some areas where algae did not formerly grow because the bottom was below the photic zone or presented unstable sediment conditions.

*Cumulative effect.* As the number of pile supported structures increase in a given area, the impacts on that area will increase. The magnitude of adverse impacts may be dependent on the characteristics of the site and on the type of structures in the area.

. . . . .

The impact from shading increases as the area being shaded increases in size. Water temperature modifications and reduced primary productivity may have an adverse impact on the food chain. The absence of algae and grasses eliminates hiding areas for fish and other organisms, but this may be offset by the new habitat created on the submerged structures [ ].

This region is characterized by numerous types of environments (Virginia Institute of Marine Science 1976). Consequently, impacts on the environment due to a specific type of structure will vary from place to place. Effects of a pier on areas such as wetlands, tidal flats, grasses, breeding nurseries, wintering and feeding areas, and migration pathways are the most significant (Carstea et al.1975a). Productivity will be decrease in the area under the pier. This can include vegetation, algae and shellfish productivity.

. . . . .

A single residential pier is not likely to have an extensive impact on recreation in the general area. However, several piers in the area may restrict recreational activities and shoreline access. Pier size and number likewise affect socioeconomics of the area. Piers used in connection with a launching ramp or marina may cause increased usage of the area and affect property values or ecological relationships.

*The possible alternatives to a timber pier used for moorage in this area would include solid-fill piers, anchor buoys, single piles, dolphins, placement of boats in local marinas, or land stor-*

age. *The use of anchor buoys or piles would cause less adverse impact to the environment.* The use of a sold-fill pier would, in most cases, be an unsatisfactory alternative due to the influence it would have on water movement and sediment transport.

Plf. Ex. 18 (emphasis added).

With regard to Lloyd Harbor in particular, Resler testified that this body of water is a state-designated significant wildlife habitat. Significantly, in environmental ranking, Lloyd Harbor is environmentally distinct from other water bodies "because it is a valuable feeding area for osprey and least terns." Also, with regard to human use, Lloyd Harbor received a zero score because of the lack of significant human use to disturb the tranquility of the area. In the Coastal Fish and Wildlife Habitat Rating Form (Def.Ex. J), there is an impact assessment for Lloyd Harbor:

IMPACT ASSESSMENT:

Any activity that would substantially degrade the water quality in Lloyd Harbor would affect the biological productivity of this area. All species of fish and wildlife would be adversely affected by water pollution, such as chemical contamination (including food chain effects), oil spills, excessive turbidity or sedimentation, and waste disposal. It is essential that high water quality be maintained to protect the hard clam fishery. Elimination of wetlands or tidal flats in Lloyd Harbor, through excavation or filling, would result in a direct loss of valuable habitat area. Dredging activities, if necessary, should be scheduled in late fall or early winter to minimize potential impacts on aquatic organisms.... *Because of the narrow configuration of the harbor, construction of shoreline structures, such as docks, piers, bulkheads, or revetments, in areas not previously disturbed by development (i.e., natural beach, tidal flats, adjacent woodlands, or salt marsh), could have a significant impact on the fish and wildlife resources of Lloyd Harbor.*

Def. Ex. 5 (emphasis added).

In view of the special environmental concerns for Lloyd Harbor, the Court questioned Resler about whether there should be a prohibition for any docks in Lloyd Harbor:

THE COURT: ... [T]hen I assume that you mean they wouldn't have docks at all.

Is that what you mean?

THE WITNESS: That is correct.

THE COURT: But because it said they could, it could, docks could have a significant impact but your opinion is that the 75 foot length, two feet deep is a compromise, so to speak, to allow some docks but not large docks?

THE WITNESS: That is correct, Judge.

Tr. at 684.

Further, Resler testified in detail about the other special qualities of Lloyd Harbor. There is no commercial activity in Lloyd Harbor. The harbor has not been dredged. It has no staked out channel. It is a shallow, narrow and constricted body of water, loaded with natural resources, vegetative wetlands and mud flats.

The parties stipulated that with regard to the Code of the Town of East Hampton, the Code of the Village of Quogue, the Code of the Village of Greenport, the Code of the Town of Riverhead and the Code of the Town of Oyster Bay, there is no provision in those codes that contain a specific limitation in dock length and width, except that in the Code of the Town of Oyster Bay, there is a mechanism which provides that if a dock is longer than 25 feet, the application must be reviewed by the Town Board.

Resler distinguished Lloyd Harbor from other bodies of water in Nassau and Suffolk Counties. For example, Manhasset Bay is wider, larger, deeper and ranges from 8 feet to 19 feet in depth, in contrast

to an average depth of 5 feet in Lloyd Harbor. Also, Little Neck Bay is larger and wider. He explained the significance, environmentally, of a larger, wider, deeper body of water:

A Significant simply because the opposing shores are further away from each other in Manhasset and Little Neck Bays than they are in Lloyd Harbor. If you are to build a 115 foot dock in Little Neck Bay or Manhasset Bay, it wouldn't have that much of an effect on how the surface water in the remainder of the harbor or the bay is used compared to Lloyd Harbor where the water body is much narrower and much shallower and the ability to use the area is more restrictive because it is so confined. These water bodies such as Manhasset and Little Neck Bay also do not have the extensive vegetative wetlands surrounding them as does Lloyd Harbor.

Those are two very big difference [sic]. As I mentioned before these two waters, Manhasset Bay and Little Neck Bay have commercial developments on them as well as residential development on then [sic] and they are dredged.

Tr. at 693–94.

Resler also described the differences between Lloyd Harbor and Huntington Harbor in that Huntington Harbor is dredged out to a greater depth and bulkheaded. Unlike Lloyd Harbor, much of it is also used for commercial activities. "It is one of the most intensely used commercial centers in the Long Island Sound Region." Also, Huntington Harbor has few natural resources and it is not a designated significant coastal fish and wildlife habitat.

Cold Spring Harbor is much larger and deeper than Lloyd Harbor, going to 76 feet in depth. It does not have the extensive tidal wetland vegetation surrounding it that is present in Lloyd Harbor. Resler is very familiar with Smithtown Bay, having been a Bay Constable and Harbor Master in that area. According to Resler, the two waterways are "most different ar-

eas." Smithtown Bay is 13 miles wide, Lloyd Harbor is 1000 feet wide; there are almost no vegetative wetlands on the Bay; it is not a designated significant coastal fish and wildlife habitat; and most of it consists of sandy beaches and barrier spaces.

Stony Brook Harbor is more similar to Lloyd Harbor in that they are both surrounded by extensive vegetative wetlands. It is a significant coastal fish and wildlife habitat and is relatively clean. However, Stony Brook has two municipal marina facilities located on it, with extensive dredging in the Harbor.

Resler testified that Lloyd Harbor has great environmental significance because it is a relatively undeveloped area in the metropolitan region, "where these areas are very rare."

A ... We don't often find areas that are not fully developed or intensely developed with shoreline structures such as docks, bulkheads, revetments, fill, houses up to the water's edge and lawns up to the water's edge. Shallow extensive areas such as this are rare on the North Shore of Long Island.

Tr. at 698.

With regard to Enrico's testimony that the dock may have a positive impact in that it can actually act as a harbor area for certain species of fish and birds, Resler agreed that this occurred during the construction period. However, once construction stops, "that sort of benefit also stops." He testified that docks will often change the eco-systems and there are many adverse environmental effects. As to the plaintiffs' expert's testimony that there would not be any environmental consequence of a dock longer than 75 feet in deeper water, Resler testified "any dock, any pier that is placed in the water is going to have an effect. It is going to effect the natural resources ... it is going to affect access, navigation, (and) visual quality ... the longer the structure ... the greater the affects. If a dock longer

than 75 feet is constructed to reach a depth of water greater than two feet, all of these affects are multiplied ... the bigger it is the greater the effect. It is as simple as that." (Tr. at 705–06). The Court finds this testimony to be logical and believable.

Resler further testified on the subject of docks, as follows:

Q Again, would you agree with this statement by Mr. Terchunian on page 386.

.    .    .    .    .

"QUESTION: Can you draw any conclusions as to whether or not the proposed Stutchin dock would constitute any interference with navigation of vessels in the Harbor?

ANSWER: It is my opinion that the proposed Stutchin dock would not have any impact on the navigation within the inner harbor of Lloyd Harbor."

Mr. Resler, do you agree with that statement by Mr. Terchunian?

A No, I don't.

Q Would you explain your answer?

A A dock is an obstruction. It is a physical obstruction to navigation over the water. Its [sic] physical presence interferes with navigation to some degree. The longer the dock gets, the more it interferes with navigation. This is not hard to understand. All docks interfere with navigation. Again, that is one of the reasons why they are regulated by the federal government and by the state and many municipalities. They cause affects.

Tr. at 707–08.

In addition, as stated above, Resler brought out that the narrow waterway has no formal, clearly-defined and marked navigation channel in which boating traffic would be confined. Therefore, the boating traffic would be more random and haphazard.

Resler was asked whether the Local Law restrictions on the length of the docks have a reasonable relationship to the environmental protection of Lloyd Harbor:

After a long detailed and deliberate study and analysis of Lloyd Harbor and the areas surrounding it, its natural resource values, its characteristics, of its development patterns, of the appropriate desired uses of the area and structures in those areas, it was determined by the village in an attempt to working with the state in order to advance state and federal policies that 75–foot long dock, or a dock that reached a length of 75 feet would be appropriate in Lloyd Harbor, given those circumstances and characteristics of the harbor.

Tr. at 744.

Resler also discussed the rights of riparian owners, which must be balanced in the enactment of legislation affecting such owners. These riparian rights include the right of access to the water; and the limited right to generally wharf out in order to reach the water, subject to the environmental laws in the public interest.

Because of the very shallow water of Lloyd Harbor, it is navigable in some areas at certain times. However, at other times and tides, vessels cannot navigate in Lloyd Harbor. For example, at "dead low tide" most vessels cannot traverse portions of the harbor. In fact, the westerly area of Lloyd Harbor is mostly a tidal mud flat at low tide. However, at mean low tide, Lloyd Harbor has an average depth of 5 feet, and the Stutchin vessel, with a draft of 3 ½ feet, can navigate the waters of the harbor.

In acting in an advisory position to the Village with regard to the Local Law involving the docks, it was Resler's opinion that an outright ban on all docks in COD1 "would probably not withstand the constitutional challenge ... and the characteristics of the area were not sufficient to support such a ban." (Tr. at 818).

On cross-examination, Resler again stated his opinion on the effect of docks in this

significant natural habitat with its narrow width:

THE WITNESS: The construction of docks in, through, over or across vegetated wetlands, for example, has an effect, an adverse effect on those wetlands no matter how big or small the dock is. If an upland property owner's property abuts the water where that vegetation exists they would ordinarily or generally have the right to build a dock across that area, if the effects to that important wetland area don't exceed certain thresholds to be significant adverse effects or changes to or adversely effect the biological integrity of that wetland. That's recognized in the approach to this issue.

Resler conceded that there was no report or scientific study that contains a specific recommendation as to the length or depth for private docks in Lloyd Harbor. Also, with regard to the damage to the bottom by mooring chains and anchors, Resler explained why this type of environmental damage was not as severe as the dock damage. He stated that the near shore areas surrounding Lloyd Harbor "are of a much higher significance in value to the ecosystem .... and the near shore area is more environmentally significant than deeper water in Lloyd Harbor." (Tr. at 836). Also, in the near shore areas, landward of the mean high water mark there is located salt marsh cord grass which is the primary vegetation that surrounds most of Lloyd Harbor. The Court finds this testimony to be credible.

Also, as to navigation, on cross-examination, Resler was closely questioned as to the width of Lloyd Harbor. Resler stated that the width of Lloyd Harbor is "anywhere from four to 600 to perhaps 1000 feet in some areas." He conceded that even at the 600-foot width, a 115 foot dock would leave 485 remaining feet for a vessel to navigate. Also, since the Mill Pond Association existing dock is 138 feet, it would obstruct navigation at a greater distance than the plaintiffs' proposed 115-foot

dock. Of course, Resler stated that the 115-foot dock would still obstruct navigation because a vessel could go around the longer dock, traverse the area between that dock and the plaintiffs' dock and then encounter that dock. The Court finds that the discussion as to the grandfathered longer docks already in the water is not really important as the major concern of the Court is with regard to the rational basis for the overall picture of any dock in the narrow, pristine, natural resource loaded waters of Lloyd Harbor. In this constitutional search, the Court need not get bogged down with minute specific details. As I stated during the trial:

MR. BRADLEY: Your Honor, again this is not a variance application. I think the question is improper given the issues in this case which deal with the overall constitutionality of the ordinance.

THE COURT: Yes, that's true. But there's also the—how this act effects this plaintiff is also important. You're right about the general nature of the ordinance. Whether it's constitutional, whether it has a rational basis is a greater in scope question than merely this plaintiff's dock. But I'm still going to—I still think it's relevant.

Tr. at 855–56.

Black's Law Dictionary defines aesthetics as "relating to that which is beautiful or in good taste." Questioned about the aesthetic factor, Resler testified as follows:

Those factors include general aesthetics, the relatively undeveloped character of the area, recognizing that there are some docks there, some of which exceed 75 feet in length.

And I think this is key here. And I'm going to speak a bit about that to place it in context with regard to aesthetics.

There is a recognition that there are docks that are longer than 75 feet throughout Lloyd Harbor. In addressing aesthetics and what character, or in recognizing the character in the area, and the intent of the Village of Lloyd

Harbor to maintain and protect that character, they developed the coastal overlay district. There were other purposes involved in that coastal overlay district as well and aesthetics was part of that.

Tr. at 905–06.

Resler also testified that the turbidity and the effects on vegetation by shading can be mitigated. In addition, he recognized the Kearney Study with regard to the effects of docks on salt marsh vegetation, which stated that, as to vegetation growth, dock height was the most significant parameter. Also, Resler is familiar with the Collegan Study with regard to salt marsh vegetation growth, which stated that dock height rather than length was the most limiting dimension. Resler knows of a study called the Biological Impacts of Minor Shoreline Structures on the Coastal Environment, which states that "in some instances fish have been attracted to construction sites," and that "pilings and piers offer substrate for algae growth in some areas where algae did not formerly grow." Further, this study states that "these structures also provide cover and feeding sites for fishes and may be used by various birds for nesting and perching." (Tr. at 948–50). He also conceded that the pilings in the proposed Stutchin dock are not closely spaced, and so would not impede water or sediment movement. Also, it appears there are no studies involving the detrimental results of an 115–foot long, 2–foot deep dock.

The cross-examination of Resler again highlighted the plaintiffs' major point namely, that the plaintiffs' Trojan boat could not remain tied to the dock at the mean low water period; and that to board the boat, the plaintiffs and their family and friends would have to take a small craft to the larger vessel moored in the stream, with the ensuing inconvenience and danger of mishaps. Further, the situation as to the plaintiffs' use of the Mill Pond Association and its 138–foot dock adjacent to their property is not clear. According to the plaintiffs, the only alternative is for them to keep a small boat to transfer to their large craft in the stream.

On redirect examination, Resler again stated the objective of COD1:

A. The overall intent of the coastal overlay district was to limit the length of docks and the depth of water ... the use associated with them to meet overall objectives throughout the overlay district, *it was to reserve sufficient space throughout the harbor for important public uses, to protect natural resources, to protect the aesthetic physical character of that portion of the area of the village, which is also a sensitive and important natural resource area. It's a significant habitat.*

The overall intent of the overlay district in the village's zoning law was to keep docks and their lengths limited for other important public uses on and over publicly owned property. *The preexisting or the non-conforming uses that are there over time can be phased out.*

Tr. at 1004 (emphasis added).

The Court credits Resler's testimony with regard to the balancing of all these factors necessary on the part of a municipality in deciding whether to permit docks and the length and size of a dock:

There are always adverse effects of a dock, always. And there is a balancing test that has to be met in deciding whether or not a dock is appropriate, and whether its size is appropriate, and whether its use is appropriate.

And I think that is part of the issue here. And in that balancing, we have to balance the effects of a private dock on public land, on the high value natural resources of Lloyd Harbor ....

Tr. at 1021.

## IV. DISCUSSION AND CONCLUSIONS

As noted above, there are four motions to be resolved: (1) the Village's motion to dismiss the complaint; (2) the Town's mo-

tion to dismiss the complaint; (3) the plaintiffs' motion for summary judgment; and (4) a cross-motion by the Village, which the Town adopts in its entirety, for summary judgment dismissing the complaint, together with a request for Rule 11 sanctions and attorney's fees and costs.

The Court has converted the motions to dismiss the complaint to motions for summary judgment, because all the parties were afforded a reasonable opportunity to present material and meet facts outside the pleadings. *See Gurary v. Winehouse,* 190 F.3d 37 (2d Cir.1999).

### A. Summary Judgment: The Standard

Summary judgment is appropriate if the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Wilkinson v. Russell,* 182 F.3d 89, 96–97 (2d Cir.1999); *In Re: Blackwood Associates, L.P.,* 153 F.3d 61, 67 (2d Cir.1998) (citing Fed.R.Civ.P. 56[c]; *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 [1986]; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 [1986] ). In deciding a summary judgment motion, the district court must resolve all ambiguities and draw all reasonable inferences in the light most favorable to the opposing party. *See Amato v. City of Saratoga Springs,* 170 F.3d 311, 322 (2d Cir.1999) (citing *Skubel v. Fuoroli,* 113 F.3d 330, 334 [2d Cir. 1997] ); *Castle Rock Entertainment, Inc. v. Carol Pub. Group, Inc.,* 150 F.3d 132, 137 (2d Cir.1998) (citing *Garza v. Marine Transp. Lines, Inc.,* 861 F.2d 23, 26 [2d Cir.1988] ).

The Court considers these standards in the context of the plaintiffs' two causes of action: (1) a Section 1983 substantive due process claim, challenging the constitutionality of the Village and Town codes at issue; and (2) a Section 1983 "taking" cause of action for monetary damages.

### B. The Plaintiffs' Claim of a Regulatory Taking

One of the central issues presented is whether the Stutchins' claim of a regulatory taking in violation of the Fifth and Fourteenth Amendments is ready for judicial review under prudential ripeness principles.

■ "There are two independent prudential hurdles to a regulatory taking claim brought against a state entity in federal court." *Suitum v. Tahoe Regional Planning Agency,* 520 U.S. 725, 733–34, 117 S.Ct. 1659, 137 L.Ed.2d 980 (1997). In the seminal case of *Williamson County Regional Planning Comm'n v. Hamilton Bank of Johnson City,* 473 U.S. 172, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985), the Supreme Court instructed that plaintiffs must demonstrate they have both received a "final decision regarding the application of the [challenged] regulations to the property at issue" from "the government entity charged with implementing the regulations," *id.* at 186, 105 S.Ct. 3108, and sought "compensation through the procedures the State has provided for doing so," *id.* at 194, 105 S.Ct. 3108; *see also Southview Assocs., Ltd. v. Bongartz,* 980 F.2d 84, 95 (2d Cir.1992) (holding that a substantive due process claim stemming from a zoning ordinance is not ripe for review absent the rendering of a final decision by the governmental entity, and also requires the plaintiff to have sought compensation if the state provides a "reasonable, certain and adequate provision for obtaining compensation."), *cert. denied,* 507 U.S. 987, 113 S.Ct. 1586, 123 L.Ed.2d 153 (1993).

■ The first hurdle springs from the ripeness doctrine. A "claim is not ripe for adjudication if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Texas v. United States,* 523 U.S. 296, 118 S.Ct. 1257, 1259, 140 L.Ed.2d 406 (1998) (quoting *Thomas v. Union Carbide Agric. Prods. Co.,* 473 U.S. 568, 581, 105 S.Ct. 3325, 87 L.Ed.2d 409 [1985] ). In deter-

mining whether a matter is ripe for review, the courts "evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Texas v. United States,* 118 S.Ct. at 1260 (quoting *Abbott Lab. v. Gardner,* 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 [1967]). With respect to the first factor, a federal court may review a land use decision by a municipal agency only if that agency has reached a "final decision." *Southview Assocs., Ltd. v. Bongartz,* 980 F.2d at 95–97. The rationale behind the finality requirement is that a court cannot determine whether a plaintiff has been deprived of property, arbitrarily or otherwise, until it has a final decision before it. *See id.* at 97. A final decision is "a definitive position on the issue that inflicts an actual, concrete injury." *Williamson County,* 473 U.S. at 193., 105 S.Ct. 3108 Unless such a final decision has been reached, a plaintiff's substantive due process claim is not ripe.

The second hurdle flows from the "Fifth Amendment's proviso that only takings without 'just compensation' infringe that Amendment; 'if a State provides an adequate procedure for seeking just compensation, the property owner cannot claim a violation of the Just Compensation Clause until it has used the procedure and been denied just compensation.'" *Suitum v. Tahoe Regional Planning,* 520 U.S. at 734, 117 S.Ct. 1659 (quoting *Williamson County,* 473 U.S. at 195, 105 S.Ct. 3108).

The plaintiffs are unable to clear either of these two hurdles.

■ First, their claim is not ripe, because they have not received a "final decision regarding the application of the [challenged] regulations to the property at issue" from "the government entit[ies] charged with implementing the regulations." *Williamson County.,* 473 U.S. at 186, 105 S.Ct. 3108. The plaintiffs have sought a variance by filing an appeal with the Village Board of Zoning Appeals, and have not yet received a final determination on the application. Moreover, the plaintiffs have not yet applied for a permit with the Town of Huntington. In *Williamson County,* the Supreme Court held that the plaintiff's claim that zoning laws had effected a taking of its property was not ripe because the plaintiff had not sought variances which would have allowed it to develop the property.

Second, the plaintiffs "cannot claim a violation of the Just Compensation Clause until [they have] used the procedure and been denied just compensation." *Suitum,* 520 U.S. at 734, 117 S.Ct. 1659 (quoting *Williamson County,* 473 U.S. at 195, 105 S.Ct. at 3121). "If[the property owners] were to seek administrative relief under these procedures, a mutually acceptable solution might well be reached with regard to [their] propert[y], thereby obviating any need to address the constitutional questions. The potential for such administrative solutions confirms the conclusion that the ... issue ... is not ripe for judicial resolution." *Hodel v. Virginia Surface Min. & Reclamation Assn.,* 452 U.S. 264, 297, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981).

Accordingly, the Court grants the defendants' motions for summary judgment dismissing the plaintiffs' Section 1983 regulatory taking claim, and denies the plaintiffs' motion for summary judgment as to the claim.

## C. The Plaintiffs' Substantive Due Process Claim

■ In assessing a substantive due process claim in the context of land use regulation, the Court must be "mindful of the general proscription that federal courts should not become zoning boards of appeal" to review non-constitutional land use determinations by local legislative and administrative bodies. *See Crowley v. Courville,* 76 F.3d 47, 52 (2d Cir.1996) (citing *Zahra v. Town of Southold,* 48 F.3d 674, 679–80 [2d Cir.1995]). Given this concern, a plaintiff asserting a substantive due process claim based on a government land use decision must sufficiently allege: (1) that

he has a constitutionally protected property interest; and (2) that the defendants arbitrarily or irrationally deprived him of that property interest. *See Southview Assocs.,* 980 F.2d at 101.

## 1. *Ripeness*

Before engaging in this due process analysis, however, the Court must determine whether plaintiffs' claim is ripe.

A substantive due process claim "premised on arbitrary and capricious government conduct ... is subject to ... the final decision prong of the *Williamson* ripeness test." *Southview Assocs.,* 980 F.2d at 97. The Second Circuit has articulated the reason for this requirement: "Unless a court has a final decision before it, it cannot determine whether a claimant was deprived of property and whether the government conduct was arbitrary or capricious." *Id.*

■ Here, the Stutchins have not yet received a final determination from the Zoning Board of Appeals, and have not even applied for a Town permit. For this reason, their substantive due process claim, like their takings claim, is not ripe for judicial review.

However, to complete the record, the Court goes on to consider the merits of the Stutchins' substantive due process claim.

## 2. *Property Interest*

To reiterate, a party raising a substantive due process claim must first establish that he had a valid property interest in a benefit that was entitled to constitutional protection at the time he was deprived of that benefit. *Zahra v. Town of Southold,* 48 F.3d at 680; *Brady v. Town of Colchester,* 863 F.2d 205, 211–12 (2d Cir.1988) (citing *Board of Regents v. Roth,* 408 U.S. 564, 576–77, 92 S.Ct. 2701, 33 L.Ed.2d 548 [1972] ). The Second Circuit has adopted a strict "entitlement" test to determine whether a party's interest in land-use regulation is protectable under the Fourteenth Amendment. *See Gagliardi v. Village of Pawling,* 18 F.3d 188, 192 (2d Cir.1994); *RRI Realty Corp. v. Incorporated Village of Southampton,* 870 F.2d 911, 918 (2d Cir.1989); *Yale Auto Parts, Inc. v. Johnson,* 758 F.2d 54, 58–59 (2d Cir.1985).

In the land use context, the entitlement test is applied "with considerable rigor," so that the federal courts will not become substitutes for state courts in their review of local land use decisions. *See RRI Realty Corp. v. Incorporated Village of Southampton,* 870 F.2d at 918. The Second Circuit has recognized that the entitlement test:

> [B]alances the need for local autonomy, with recognition of constitutional protection at the very outer margins of municipal behavior. It represents an acknowledgment that decisions on matters of local concern should ordinarily be made by those whom local residents select to represent them in municipal government—not by federal courts. It also recognizes that the Due Process Clause does not function as a general overseer of arbitrariness in state and local land use decisions; in our federal system, that is the province of the state courts.

*Zahra,* 48 F.3d at 680.

### a. *Riparian rights*

An important concept involves the notion of riparian rights. "A riparian owner is one whose land is bounded or traversed by a natural stream, while a littoral owner is one whose land abuts on a lake or sea. However, the terms are often used interchangeably, and the term 'riparian' is often used to refer to both types of ownership." 109 N.Y. Jur.2d Wharves § 10 (1993).

■■ "The owner of land abutting a navigable tidal waterway has the right to use the area over the underwater land fronting on his property for access to navigable water, even if title to the underwater land is held by another." *Bravo v. Terstiege,* 196 A.D.2d 473, 475, 601 N.Y.S.2d 129, 131 (2d Dept.1993) (citing *Tiffany v. Town of Oyster Bay,* 234 N.Y. 15, 136 N.E.

224 [1922]; *Trustees of Town of Brookhaven v. Smith*, 188 N.Y. 74, 80 N.E. 665 [1907]; 3 Warren's Weed, New York Real Property, Land Under Water, §§ 1.02[2]; 6.02[3]; 6.05[3]; 6.06[1] [3d ed] ). "The right of access comprehends the reasonable, safe and convenient use of the foreshore for navigation, fishing and such other purposes as commonly belong to the riparian owner, exercised in a reasonable manner." *Bravo v. Terstiege*, 196 A.D.2d 473, 475, 601 N.Y.S.2d 129, 131 (2d Dept. 1993) (*Town of Hempstead v. Oceanside Yacht Harbor*, 38 A.D.2d 263, 264, 328 N.Y.S.2d 894 [2d Dept.1972], *aff'd*, 32 N.Y.2d 859, 346 N.Y.S.2d 529, 299 N.E.2d 895 [1973] ).

In view of the fact that the Stutchins' property borders on Lloyd Harbor, they have certain riparian rights, including access from such land to navigable waters. *See Gucker v. Town of Huntington*, 268 N.Y. 43, 47, 196 N.E. 737 (1935); *Town of Islip v. Powell*, 78 Misc.2d 1007, 1013, 358 N.Y.S.2d 985 (Sup.Ct. Suffolk Cty.1974); Am.Jur.2d Waters § 93. Further, they are entitled to "reasonable, safe and convenient access to the water for navigation, fishing and other uses as commonly belong to riparian ownership" *Tiffany v. Town of Oyster Bay*, 234 N.Y. 15, 21, 136 N.E. 224 (1922). "The scope of what is a reasonable, safe and convenient use of the upland owner's riparian rights has been gradually defined on a case-to-case foundation." *Town of Hempstead v. Oceanside Yacht Harbor*, 38 A.D.2d 263, 264, 328 N.Y.S.2d 894, *aff'd*, 32 N.Y.2d 859, 346 N.Y.S.2d 529, 299 N.E.2d 895.

Nevertheless, "[t]he rights of riparian owners must yield to the State's legitimate exercise of police power." *Matter of Haher's Sodus Point Bait Shop, Inc. v. Wigle*, 139 A.D.2d 950, 951, 528 N.Y.S.2d 244, 247 (4th Dept.1988), *lv. denied*, 73 N.Y.2d 701, 535 N.Y.S.2d 595, 532 N.E.2d 101 (1988). Specifically, the right of access for navigation, and the "right to make a landing, wharf, or pier for one's own use, or for the use of the public, are subject to

such general rules and regulations as the Legislature may see proper to impose for the protection of the rights of the public, whatever these may be." *Thousand Island Steamboat Co. v. Visger*, 179 N.Y. 206, 210, 71 N.E. 764 (1904). "The State not only has rights as the owner of the underlying land, *see Pyle v. Miller Estate*, 163 A.D.2d 820, 558 N.Y.S.2d 354 (4th Dept.1990), the public also has certain rights, inasmuch as the [localities] hold[ ] that land in the public trust." *Schwartz v. Hudacs*, 149 Misc.2d 1024, 1029, 566 N.Y.S.2d 435, 438 (Sup.Ct. Ontario Cty. 1990) (citing *Phillips Petroleum Co. v. Mississippi*, 484 U.S. 469, 108 S.Ct. 791, 98 L.Ed.2d 877 [1988]; *Illinois Central R. v. Illinois*, 146 U.S. 387, 13 S.Ct. 110, 36 L.Ed. 1018 [1892]; *Smith v. State of New York*, 153 A.D.2d 737, 545 N.Y.S.2d 203 [2d Dept.1989] ).

### b. *Montero v. Babbit*

The Court finds instructive the case of *Montero v. Babbitt*, 921 F.Supp. 134, 139 (E.D.N.Y.1996), which the Second Circuit summarily affirmed, 104 F.3d 356, 1996 WL 719910 (2d Cir.1996). In that case, two private owners of shore front property in Oyster Bay, New York, challenged a decision of the United States Fish and Wildlife Service ("USFWS") denying them permission to construct a private dock in Cold Spring Harbor, New York. The plaintiffs owned frontage property that runs approximately 300 feet along the mean high water line of Cold Spring Harbor. In 1968, the Town of Oyster Bay had conveyed much of the land below the mean high water line in Oyster Bay, Cold Spring Harbor and Mill Neck Creek, to the United States for purposes of serving as a wildlife refuge. The plaintiffs moored a boat off their property and used a dinghy launched from the shoreline to reach it. In 1991, the plaintiffs applied to the USFWS for permission to construct a 180-foot dock. The USFWS denied the Special Use permit based on its policy prohibiting all unauthorized docks, unless the

docks existed before the 1968 grant and were still in useable condition at the time of the application. Relevant to this discussion, the plaintiffs brought several claims before Judge Hurley, including the following: (1) the denial violated their riparian rights and deprived them of property without due process of law; (2) the USFWS decision was arbitrary and capricious.

In a thoughtful and thorough opinion, which Judge Hurley authored following a non-jury trial, the Court upheld the Government's power to restrict riparian owners' rights to access navigable waters. While acknowledging the basic principle of riparian access, the Court determined that the USFWS could severely restrict such access through exercise of the police power. Significantly, Judge Hurley found that the landowners had not "been denied their riparian right of access to the navigable portions of the bay," but merely had their "mode of access ... limited to a dingy launched from the foreshore of their property." *Id.* at 139.

In *Montero,* the plaintiffs presented expert testimony "about the *de minimis* ecological effect that plaintiffs' dock would produce." *Id.* at 141. However, Judge Hurley found that such evidence was "more than counterbalanced by defendants' proof" that the agency rendered its decision in light of all other development already ongoing in the refuge, rather than viewing the plaintiffs' request in isolation. *Id.*

c. *The Stutchins' Property Interest*

▇▇▇ Application of the foregoing analysis leads the Court to conclude that the Stutchins established that, as owners of land abutting a navigable tidal waterway, they have the right of access which comprehends the *"reasonable,* safe and convenient use of the foreshore for navigation, fishing and such other purposes as commonly belong to the riparian owner, exercised in a reasonable manner." *Bravo v. Terstiege,* 196 A.D.2d at 475, 601 N.Y.S.2d at 131 (citation omitted) (emphasis added). Such a right is qualified, however, and

"must yield to the State's legitimate exercise of police power." *Matter of Haher's Sodus Point Bait Shop, Inc. v. Wigle,* 139 A.D.2d at 951, 528 N.Y.S.2d at 247; *see also Thousand Island Steamboat Co. v. Visger,* 179 N.Y. at 210, 71 N.E. 764. Moreover, under the authority of *Montero,* the Stutchins have not even "been denied their riparian right of access to the navigable portions of the bay"; rather, they merely have had their "mode of access ... limited to a dingy launched from the foreshore of their property." 921 F.Supp. at 139.

3. *Arbitrary or Irrational Basis*

▇▇▇ Further, the plaintiffs do not establish the second prong of a substantive due process claim, namely, that the Village and the Town acted in an arbitrary or irrational manner. *See Crowley v. Courville,* 76 F.3d at 52. Such a finding may be made "only when government acts with 'no legitimate reason for its decision.'" *Id.* at 47 (quoting *Southview Assocs.,* 980 F.2d at 102).

The Second Circuit has instructed that:

Generally a municipal zoning ordinance is presumed be valid, *see City of Cleburne v. Cleburne Living Center,* 473 U.S. 432, 440, [105 S.Ct. 3249, 87 L.Ed.2d 313] (1985), and will not be held unconstitutional if its wisdom is at least fairly debatable and it bears a rational relationship to a permissible state objective. *Id.; Village of Belle Terre v. Boraas,* 416 U.S. 1, 4, 8 [94 S.Ct. 1536, 39 L.Ed.2d 797] (1974); *Village of Euclid v. Ambler Realty Co.,* 272 U.S. 365, 388–90 [47 S.Ct. 114, 71 L.Ed. 303] (1926).

Moreover, unless they impinge upon a constitutionally protected fundamental interest, we review zoning ordinances only to determine whether they are arbitrary or unreasonable, *see RRI Realty Corp. v. Incorporated Village of Southampton,* 870 F.2d 911, 914–15 (2d Cir. 1989) ("zoning regulations will survive substantive due process challenge unless

they are 'clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare'") (quoting *Ambler Realty Co.*, 272 U.S. at 395 [47 S.Ct. 114]); *Brady v. Town of Colchester*, 863 F.2d 205, 215–16 (2d Cir.1988); *Horizon Concepts, Inc. v. City of Balch Springs*, 789 F.2d 1165, 1167 (5th Cir.1986) (because zoning is a quasi-legislative process, local zoning ordinances are reviewed only to determine if arbitrary and capricious). A federal court typically will not "sift through the record to determine whether policy decisions are squarely supported by a firm factual foundation." *City of Cleburne*, 473 U.S. at 458 [105 S.Ct. 3249] (Marshall, J., concurring in judgment in part and dissenting in part) (citations omitted).

*Greene v. Town of Blooming Grove*, 879 F.2d 1061, 1063–64 (2d Cir.1989)

Here, in the Court's view, "[t]here is nothing to indicate that the zoning ordinance[s] in question here bear[ ] anything other than a rational relationship to a legitimate government objective." *Orange Lake Associates, Inc. v. Kirkpatrick, supra*, 21 F.3d at 1225 (holding that the limitation of future development around a lake, an environmentally critical area according to the Town's planning consultants, was a legitimate government objective and therefore a zoning ordinance which resulted in the denial of putative real estate developer's plan for housing project in the area did not violate due process) (citing *Village of Belle Terre v. Boraas*, 416 U.S. 1, 8, 94 S.Ct. 1536, 39 L.Ed.2d 797 [1974]; *Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 395, 47 S.Ct. 114, 71 L.Ed. 303 [1926][a property owner can challenge the constitutionality of a zoning restriction if it is "clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare"]); *Greene v. Town of Blooming Grove*, 879 F.2d 1061, 1063–64 (2d Cir.1989).

The Court finds that there was a substantial rational basis for reducing the size of docks in these waters, including the Village's and Town's concerns regarding: (1) obstruction to navigation; (2) preservation of the pristine natural habitat and precious resources of Lloyd Harbor; and (3) aesthetics.

### a. *Navigation*

Crucial to the Court's determination is the narrow width of the water in the Inner Harbor of Lloyd Harbor. Several witnesses, including those testifying on behalf of the plaintiff, underscored this point. Hawke approximated that the average width of Lloyd Harbor was merely "a few hundred yards across ... a fairly narrow body of water." (Tr. at 97). Morrongiello testified that the harbor only "comprises some 800 or so acres of surface and it is only an average depth of about five or six feet." The plaintiffs' expert witness Terchunian confirmed that the length of the Lloyd Harbor coastline is only 22 miles; the average depth of the water is 5 feet at low water; the tidal range, namely, the difference between high and low water, is 7.4 feet; the approximate area of Lloyd Harbor is a mere 600 to 800 acres. Resler, the only disinterested expert witness in this case, described Lloyd Harbor as a "relatively shallow, narrow, high value water body surrounded to a large extent by very high value vegetative tidal wetlands." (Tr. at 516). Even under the most generous view of the evidence, the width from land to land at low tide is approximately 1000 feet.

The Court credits the testimony of the numerous witnesses who testified that the limitation on dock length in the Inner Harbor was reasonable in view of the narrow, shallow nature of this waterway. In this regard, the Court points to Resler's comment that the dock would be a physical obstruction in the area seaward of mean high water and would adversely affect navigation. In addition, Resler observed that the narrow waterway has no formal, clearly-defined and marked navigation channel

in which boating traffic would be confined. Therefore, the boating traffic would be more random and haphazard. Because of the very shallow water of Lloyd Harbor, it is navigable in some areas at certain times and, at other times and tides, vessels cannot navigate in Lloyd Harbor. For example, at "dead low tide" most vessels cannot traverse portions of the harbor. In fact, as stated above, the westerly area of Lloyd Harbor is mostly a tidal mud flat at low tide.

### b. *Critical Environmental Area*

The desire to protect the environment of the Inner Harbor serves as another substantial rational basis for reducing the length of the docks. There is no commercial activity in Lloyd Harbor. The harbor has not been dredged. It has no staked out channel. It is a shallow, narrow and constricted body of water, brimming with natural resources, vegetative wetlands and mud flats. Resler testified that Lloyd Harbor has great environmental significance because it is a relatively undeveloped area in the metropolitan region, "where these areas are very rare."

COD1, which encompasses the plaintiffs' home and dock area, covers the inner area of Lloyd Harbor and another body of water called Puppies Cove. Hawke explained that the Inner Harbor was classified as COD1 because it included "more sensitive ecological areas and required more protection than areas in the other parts of the coastline." According to Hawke, the primary purpose of the formation of the COD 1 was *"to preserve the sensitive ecological balance in the inner harbor.* It is an area which requires protection. It's a very sensitive ecological environment and it was felt that it needed protection." (Tr. at 102–03) (emphasis added).

Even the plaintiffs' expert witness, Enrico, conceded that Lloyd Harbor is designated by the New York Department of State as a significant fishing and wildlife habitat, and that the area is a *"unique shallow embayment on the North Shore of Long Island."* (Tr. at 294) (emphasis add-

ed). He added that Lloyd Harbor is a waterfowl watering and feeding area; a habitat for wading birds and raptors; a nursery and feeding habitat for commercially and recreationally important marine fish species; an important location for recreational activities for residents of the Village; and an important shell fishing location.

Resler agreed, saying that Lloyd Harbor "has such high value that it is a state designated significant coastal fish and wildlife habitat." Resler testified that there are extensive vegetative wetlands surrounding much of Lloyd Harbor, composed primarily of Spartina Alterniflora which grows primarily between mean high and mean low water. Also, there is Spartina patens in the shallow mud flats and shoal areas. These latter vegetative growths "are of a very high value in an ecosystem ... much more sensitive to disturbance than deeper areas far off shore." (Tr. at 518). This vegetation is also one of the primary components of the fishing life habitat.

In particular, Resler described the area where the plaintiffs propose to place their dock as a relatively shallow area with the shore consisting of vegetative tidal wetlands:

> They are salt marsh cord grass. It is the common grassy vegetation you see when you look out in the Great South Bay and the North Shore embankments. The area is somewhat seaward of mean low water, and I will make it clear that the Spartina Alterniflora grows primarily between mean high and mean low water.
>
> The area seaward of the Alterniflora in the area where Mr. Stutchin proposes to build this dock also consists of mud and shoals. Those areas are extremely productive as tidal wetlands in Lloyd Harbor and they are an essential component of the Lloyd Harbor significant coastal wildlife habitat, which is a formal designation of the water body known as

Lloyd Harbor, as an especially significant area because of its natural resources, qualities and values.

Tr. at 579.

Resler distinguished Lloyd Harbor from other water bodies "because it is a valuable feeding area for osprey and least terns." Hawke elaborated on this point, testifying that the Inner Harbor hosts "all kinds of plant growth, fish and shellfish." Morrongiello agreed that the Inner Harbor was replete with waterborne animals and plants. "It's a great shell fishing area ... there are waterfowl that [are] native to the area and it is a wintering-over place for many birds." (Tr. at 178).

In the Court's view, the limitation on dock length served the rational purpose of preserving these cherished natural resources. Notably, the Clark Study concluded that any dock in the harbor had an impact on the ecology with regard to cutting light off in portions of the floor of the harbor and in other respects. Moreover, Resler described how the Stutchins' proposed dock would affect vegetated and unvegetated tidal wetlands; impact the salt marsh in the area; shade the growing vegetation; cause a physical disturbance to the vegetation; change the composition of the area; and harm the organisms that rely on sunlight.

Further, Resler stated that the propeller of the plaintiffs' 36–foot boat, drawing approximately 3½ feet of water, would blow segments from the bottom and cause a plume of mud behind the vessel. The shallower the water, the more disturbance to the bottom, and that would be accentuated in the shallow waters of Lloyd Harbor. In such shallow water, the plaintiffs' boat would "sit on the bottom in low tide and ... physically destroy whatever organisms are underneath it" (Tr. at 617). Resler stressed that the more sensitive area of Lloyd Harbor is near the shore, the most vegetation productive portion of Lloyd Harbor.

The Court also credits Resler's departmental study of the impact of docks, which noted that docks have an adverse effect on navigation and natural resources, especially docks in excess of 100 feet. "The longer the dock, the greater ... the effects. These effects are magnified exponentially." (Tr. at 628). The United States Department of Commerce pamphlet, entitled "Biological Impacts of Minor Shoreline Structures on the Coastal Environment: State of the Art Review. Volume 1" confirmed many the ill effects of docks. (Plf.Ex. 18). Also, the Coastal Fish and Wildlife Habitat Rating Form (Def.Ex. J), includes an impact assessment of Lloyd Harbor, which states that "Because of the narrow configuration of the harbor, construction of shoreline structures, such as docks, piers, bulkheads, or revetments, in areas not previously disturbed by development (i.e., natural beach, tidal flats, adjacent woodlands, or salt marsh), could have a significant impact on the fish and wildlife resources of Lloyd Harbor." (Def.Ex. 5) (emphasis added).

### c. *Aesthetics*

Finally, aesthetics serve as another rational basis for the decision by the Town and the Village to limit dock length in this pristine, narrow body of water. The Court finds that there was a substantial rational basis for reducing the size of docks in these waters, so as to limit human intrusion in this special natural and relatively undeveloped wildlife area in the midst of a suburban world.

In this regard, the Court credit's Resler's testimony that "In addressing aesthetics and what character, or in recognizing the character in the area, and the intent of the Village of Lloyd Harbor to maintain and protect that character, they developed the coastal overlay district. There were other purposes involved in that coastal overlay district as well and aesthetics was part of that.... [The Village] has enacted standards for the types of docks that are allowed in the village in order to address aesthetics, in order to maintain and protect

the character of the village." (Tr. at 905–06, 909).

Accordingly, in view of the navigational, environmental and aesthetic concerns outlined above, the Court finds that the zoning ordinances in question bear "a rational relationship to a legitimate government objective." *Orange Lake Associates, Inc. v. Kirkpatrick*, 21 F.3d at 1225. The Court concludes that this Village Code and the Town Code pass constitutional muster. The Court therefore grants the Village and Town's motions for summary judgment dismissing the Complaint, and denies the plaintiffs' motion for summary judgment.

### D. The Plaintiffs' State Law Claims

As noted at the outset, the plaintiffs' complaint raised a claim under New York State law, namely, that the designation of Lloyd Harbor as a Critical Environmental Area failed to comply with certain procedural requirements of New York Law. In the Court's view, the plaintiffs abandoned this state law claim because they did not press the issue at any point during the extensive hearing before the Court, and they did not mention the subject in their post-hearing memoranda. However, even if the plaintiffs had not abandoned this New York State law claim, the Court would decline to exercise supplemental jurisdiction because the Court has dismissed all of the plaintiffs' remaining Federal and Constitutional claims. *See* 28 U.S.C. § 1367(c).

### E. Rule 11 Sanctions, Attorneys' Fees and Costs

Finally, the Village and Town make a brief motion for the imposition of Rule 11 Sanctions against the plaintiffs, and for the awarding of attorneys' fees and costs as the prevailing parties under 42 U.S.C. § 1988(b).

■ With respect to the defendants' motion for Rule 11 sanctions, it is denied because it is contained in the Village's cross-motion for summary judgment, thereby not affording the plaintiffs the separate notice required by Rule 11. *See L.B. Foster Co. v. America Piles, Inc.*, 138 F.3d 81 (2d Cir.1998). Moreover, on the merits, if properly brought before the Court, it would have been denied.

■ The Court also rejects the defendants' motion pursuant to 42 U.S.C. § 1988(b) for the awarding of attorneys' fees and costs on the basis that the plaintiffs' claims were frivolous, unreasonable, or without foundation. As this Court observed in *Davenport v. Nassau County Sheriff's Dept.*, 22 F.Supp.2d 40, 41 (E.D.N.Y.1998), the Supreme Court has "discouraged the awarding of reasonable attorney fees and costs where the prevailing party is the defendant." *Id.* (citing *Hughes v. Rowe*, 449 U.S. 5, 14, 101 S.Ct. 173, 66 L.Ed.2d 163 [1980][per curiam]; *Christiansburg Garment Co. v. Equal Employment Opportunity Commission*, 434 U.S. 412, 422, 98 S.Ct. 694, 54 L.Ed.2d 648 [1978] ). Regardless, the Court does conclude that the plaintiffs' action was not "frivolous, unreasonable, or groundless, or . . . [that] the plaintiff[s] continued to litigate after it clearly became so." *LeBlanc–Sternberg v. Fletcher*, 143 F.3d 765, 769 (2d Cir.1998) (quoting *Christiansburg*, 434 U.S. at 422, 98 S.Ct. 694). The plaintiffs' action raised viable and proper issues. Accordingly, the defendants' motion for attorneys' fees and costs is denied.

### V. CONCLUSION

Having conducted a hearing, heard oral argument, reviewed the parties' submissions, and for the reasons set forth above, it is hereby

**ORDERED,** that the motions of the Town and the Village to dismiss the Complaint are converted to motions for summary judgment; and it is further

**ORDERED,** that the Village's motion for summary judgment dismissing the complaint, is granted; and it is further

**ORDERED,** that the Town's motion for summary judgment dismissing the complaint, is granted; and it is further

**ORDERED,** that the plaintiffs' motion for summary judgment is denied; and it is further

**ORDERED,** that the motion by the Village, which the Town adopts in its entirety, for Rule 11 sanctions, attorneys' fees and costs is denied; and it is further

**ORDERED,** that the complaint is dismissed in its entirety; and it is further

**ORDERED,** that the Clerk of the Court is directed to close this case.

**SO ORDERED.**

## EXHIBIT A